# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------

Domenico Broccoli, GLD3, LLC,
Snook-9 Realty, Inc.

     *Plaintiffs,*

   *v.*

Lance Ashworth, Mara Farrell,
Greenhouse Consultants Incorporated,
Hunter Research, Inc., Richard W. Hunter,
Douglas Mackey, William Sandy,
Stephen Thomson, and Does 1 - 25.

     *Defendants.*

------------------------------------------------------

No._____

**JURY TRIAL DEMANDED**

# COMPLAINT

Plaintiffs Domenico Broccoli, GLD3, LLC and Snook-9 Realty, Inc. allege upon personal knowledge as to themselves and upon information and belief as to other matters, as follows:

## PRELIMINARY STATEMENT

### *"A lie gets halfway around the world before the truth has a chance to get its pants on."*

1.      Plaintiffs, are the owners of real property and developers of a proposed commercial development project in Fishkill, New York.  After failing to raise the money needed to purchase Plaintiffs' property, Defendants devised a scheme to "strangle" and "bleed" Plaintiffs by stopping or delaying Plaintiffs' commercial development so as to force the sale of Plaintiffs' property for pennies on the dollar.  Plaintiffs' development project is known as "Continental Commons."

2.      Recognizing the power of a lie, Defendants created a series of well-crafted lies aimed at devaluing Plaintiffs' property and destroying Plaintiffs' business interests.  Indeed, the lies formed the foundation of Defendants' "strangle" and "bleed" scheme.  The lies, once released, would prove almost impossible for Plaintiffs to combat, causing millions of dollars in damages to Plaintiffs.

3.      Defendants are officers, members and supporters of a not-for-profit 501(c)3 organization knows as the Friends of the Fishkill Supply Depot ("FOFSD"), whose stated purpose is the "permanent protection of the Continental Army Burial Complex within the boundaries of the Fishkill Supply Depot, stringent archaeological review of development projects that may affect the site, preservation of archaeological resources associated with the Fishkill Supply Depot during the Revolutionary Period, and the future interpretation of the historic site for public benefit."

4.       While the stated purpose may appear to be dutiful, in reality Defendants' goal is to defraud Plaintiffs of their property and to cause injury to Plaintiffs.  Through the FOFSD, Defendants have made intentionally and knowingly false statements to the public, financial donors, politicians,

governmental bodies, courts and the media to intentionally confuse Plaintiffs' property with a Revolutionary War complex known as the "Fishkill Supply Depot." Defendants did so to block the development of Continental Commons; devalue Plaintiffs' property and to cause injury to Plaintiffs.

5.      Defendants' ultimate goal of wresting ownership of the Property from Plaintiffs was made clear by Defendant Ashworth. Sounding more like a La Cosa Nostra Caporegime than an FBI Special Agent, Ashworth said clearly and unambiguously, "We're on intersecting paths. We are going to keep on telling people about it. The land value is going to be down. He is going to be like 'shit' the only people I can sell it to are these guys. We are going to strangle him basically. Bleed him out."

6.      Defendants want the Property so they can create a tourist destination based on the false claim that the Property is part of the larger Fishkill Supply Depot. Defendants will run a for-profit business in which they will conduct "cultural heritage tours" during which visitors will engage in mock-archaeological digs and find manufactured artifacts.

7.      The strangle and bleed scheme was designed and coordinated with military precision by a West Point graduate and U.S. Army veteran. The scheme, led by Defendant Ashworth involves a multi-layered web of information laundering, historical and archaeological distortion, physical alteration of Plaintiffs' property, and making knowingly false statements to federal, state and local governmental entities. Defendants' scheme is supported by an illegal and misleading fundraising campaign, the proceeds of which have been used to support the fraudulent scheme. Defendants' actions have resulted in an assault on Plaintiffs' livelihood, causing them millions of dollars in damages.

## THE PARTIES

**Plaintiffs**

8.     Plaintiff Domenico Broccoli is a resident, citizen, and domiciliary of New York.  Broccoli is a principal in both GLD3, LLC and Snook-9 Realty Inc.  He has owned the Property since 1986. Plaintiff Broccoli is a graduate of the Culinary Institute of America and a lifelong restauranteur, who presently owns and operates four IHOP franchises, among other ventures.

9.     Plaintiff GLD3, LLC is a New York limited liability company that seeks to develop the Property.

10.     Plaintiff Snook-9 Realty Inc. is a New York corporation that owns the Property.

**Defendants**

11.     Defendant Lance Ashworth is a resident, citizen, and domiciliary of Fishkill New York. He is the President of FOFSD.  Defendant Ashworth leads FOFSD's fundraising operations and makes all strategic decisions for the organization.  Defendant Ashworth is currently a Special Agent with the Federal Bureau of Investigation in Dutchess County.

12.     Defendant William "Bill" Sandy is a resident, citizen, and domiciliary of New York. Defendant Sandy, a registered professional archaeologist, is the "resident archaeologist" for Defendant FOFSD and a member of its board.

13.     Defendant Mara Farrell, co-founder of FOFSD, is a resident, citizen, and domiciliary of New York. She is the co-founder of Defendant FOFSD. Defendant Farrell works as a Public Relations executive in Beacon, New York.

14.     Defendants Ashworth, Sandy and Farrell and Does 1-10 are officers and members of the FOFSD and are referred to herein, at times, as the "RICO Defendants."

4

15.    Defendant Hunter Research Inc. is a historical research and archaeology consulting firm based in Trenton New Jersey. Defendant Hunter Research Inc. was incorporated in the state of New Jersey in 1989 with an Entity ID of 0100407075.  From 2015-2016, Defendant Hunter Research Inc. worked for Defendant FOFSD with funding support from the National Park Service's American Battlefield Protection Program (ABPP), and knowingly prepared a report that intentionally mischaracterized archaeology so as to create the appearance that Plaintiffs' Property contained sensitive artifacts and burials relating to the Fishkill Supply Depot.

16.    Defendant Richard W. Hunter is the principal of Hunter Research Inc.  He is a resident, citizen and domiciliary of New Jersey.

17.    Defendant Douglas P. Mackey is a resident, citizen and domiciliary of New York. Defendant Mackey was formerly a Historic Preservation Program Analyst for the New York State Historic Preservation Office ("NYSHPO").  Defendant Mackey had strong ties to Defendant FOFSD and was assigned by NYSHPO to advise on the historical significance of the Property. Mackey abused his role with NYSHPO to extend the investigation, so as to increase Plaintiffs' costs and to delay and/or block Continental Commons.  Mackey's coordination with the other defendants was integral to defendants' "strangle" and "bleed" scheme, causing Plaintiffs to spend millions of dollars than would otherwise have been required.

18.    Defendant Stephen Thomson is a resident, citizen and domiciliary of New York. Defendant had strong ties to the RICO Defendants and was a member of the FOFSD.  Defendant Thomson was a member of the Town of Fishkill Planning Board.  Defendant Thomson abused his role on the Planning Board to extend the investigation of the Property, so as to increase Plaintiffs' costs and to delay and/or block Continental Commons.

19.    Defendant Greenhouse Consultants Incorporated is a historical research and archaeology consulting firm based in Atlanta Georgia.  Defendant Greenhouse Consultants Incorporated was

incorporated in the state of Georgia in 1983 with a Company Number of 881754 and has an office located at 40 Exchange Place, New York, New York 10005.  Greenhouse Consultants Incorporated prepared a knowingly false report that intentionally mischaracterized the historical and archaeological record to create the appearance that Plaintiffs' property was related to the Fishkill Supply Depot.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction of the claims here pursuant to 18 U.S.C. § 1964(c), 18 U.S.C. § 1965, and 28 U.S.C. § 1331.  This civil action arises under the laws of the United States as Plaintiffs alleges violations of their rights under the Racketeer Influenced and Corrupt Organizations A

21.     ct ("RICO"), 18 U.S.C. § 1961 et seq.  Declaratory relief is available pursuant to 28 U.S.C. §§ 2201 and 2202. 42.

22.     This Court has supplemental jurisdiction as to Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.  The state law claims in this complaint are related to the claims in which this Court has original jurisdiction in that they form the same case or controversy under Article III of the Constitution.  These state law claims are based on the same operative facts, as more clearly set forth below.

23.     Judicial economy, convenience, and fairness to the parties to this action will result if this Court assumes and exercises supplemental jurisdiction over the state law claims alleged herein.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because, among other things, a substantial part of the transactions and events giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### *The Property*

25.     Plaintiffs are the owners of a 10.4-acre parcel in the Town of Fishkill, New York.  The Property is located on a commercially developed stretch of Route 9.



**Figure 1.**

26.     The Property was purchased in or around 1986 by Plaintiffs' predecessor company, Touchdown Development Corporation ("Touchdown").  In the 1990s, Touchdown built a gas station and convenience store on one and a quarter acre of land on the northwest portion of the Property.  Touchdown obtained the necessary approvals from the Town of Fishkill and NYSHPO

to do so.  The Town's review process was completed in less than two years.  Plaintiffs own the gas station which is still in operation today.

27.     Thereafter, in and around 2000, Plaintiffs sought approval to build a hotel on the northeast portion of the Property - i.e., the same area of the Property to be developed as Continental Commons.  The New York State Historical Preservation Office ("SHPO"), under the supervision of Defendant Mackey, and the Town of Fishkill's review of the proposed hotel was completed in less than a year.  Despite obtaining approval for the hotel, Plaintiffs decided not to move forward with the hotel development at that time.

28.     In or around 2006, Plaintiffs began to develop their plan for Continental Commons on the remaining 10 plus acres of land, which will operate as a commercial, social and educational center with a restaurant, shops and an inn.

29.     Although the Property is not home itself to the Revolutionary War events that Defendants claim it is, Continental Commons will incorporate features that will allow visitors to enjoy an interactive and immersive historical experience as the development integrates plaques and architectural elements from historically significant buildings in Dutchess County during the time of the American Revolutionary War.

30.     In addition, Continental Commons will create a Dutchess County Visitor's Center which will enhance the attraction of the neighboring Fishkill Historical Society to visitors, and teach them about the rich history of the Town of Fishkill and its relationship to the American Revolution. The project will also include an amphitheater, educational walking trail, replica barracks museum, and other Revolutionary War exhibits.  The design will also keep a 19th century barn ruin/foundation that is located on the Property open for public viewing.

### *The Fishkill Supply Depot Site and the Archaeological Studies*

31.     Like much of the land in Fishkill and neighboring towns, the Property falls within the sprawling boundaries of what has been dubbed by modern historians as the "Fishkill Supply Depot."

32.     The Property also falls within the 74-acre National Register of Historic Places tract.  Most of the extensively developed Village of Fishkill is on lands listed on the National Register of Historic Places, including a recently built Home Depot, a McDonalds, hotels, two banks, Plaintiffs' gas station, convenience store and car wash along with the Maya Café Mexican Restaurant (on the corner directly to the south of Plaintiffs' Property) other commercial enterprises.

33.     The term "Fishkill Supply Depot," first used in by archaeologists in the 1970s, has been used inconsistently in the archaeological literature to refer to very different properties.  First, it has been used to refer to the overall historic depot used during the Revolutionary War (hereinafter, "greater Fishkill Supply Depot").  This larger depot consisted of a wide range of diverse and distinct facilities that were not located on contiguous properties, but instead were dispersed throughout a large area of portions of Village of Fishkill, East Fishkill and extending as far south as Snow Valley and as far west as Fishkill Landing, which is now known as the City of Beacon.

34.     The term can also be used to refer to the National Register property known as the Fishkill Supply Depot National Register Site ("National Register Site"), which consists of 74 contiguous acres, and is only a small part of the greater Fishkill Supply Depot.

35.     Because of the vast range of the greater Fishkill Supply Depot, it is impossible to calculate any precise acreage for the overall depot.  The National Register Site constitutes only of a small portion of the greater Fishkill Supply Depot.

36.     While the Property is located within the National Register Site, there is no credible basis for or evidence to support referring to the Property as the "Fishkill Supply Depot"; as the entire greater Fishkill Supply Depot, or as a site containing the most important Supply Depot facilities.

*The Burial Area*

37.     In developing the Continental Commons proposal, Plaintiff was required to conduct archaeological research on the Property, which incorporated a review of extensive prior studies that had been carried out over half a century.   Since 1968, more than a dozen independent archaeological studies have been completed on the Property by numerous parties.

38.     In and around October and November 2007, the archaeological investigation that was approved and supervised by Defendant Mackey identified 7 suspected grave shafts located in the southwest corner of the Property.   The northernmost suspected grave feature was investigated, confirming one human burial.   In 2013, additional archaeological testing was undertaken, also under Defendant Mackey's supervision, which delineated the northern and eastern most boundaries of the burial area.   In all, the burial area comprises 0.4 acres in the southwest corner of the Property.

39.     Other than looking for artifacts in and around the identified graves, no attempts have been made to date the remains and/or identify the individual who was buried on the Property.   When the human burial was identified, no artifacts were in the grave that could be used to identify the individual, or even date the burial.   There was no evidence to suggest that the individual buried on the Property was from the Revolutionary-era, let alone a Revolutionary soldier.

40.     Still, Plaintiff was required to conduct an additional archaeological investigation of the potential for burials in the northern portion of the Property north of the creek known as "Raiche Run" (named after the former owners of the Property) - *i.e.*, the area of the Property to be

10

developed.  A 2012 report found that "[n]o graves or significant archaeological features were identified" in the northern portion of the Property.

41.     Notwithstanding this lack of evidence linking the Property or the burial area to the Revolutionary War, Plaintiffs' development plan designates and memorializes the burial area in the southwest corner of the Property as a burial ground.  Plaintiffs cannot build in the burial area. Instead, Plaintiffs will provide public access to the burial area, and will install appropriate signage and educational information to honor those who lost their lives fighting for independence.

### Defendants' Fraudulent Scheme To "strangle" and "bleed" Plaintiffs

42.     Defendants' "strangle" and "bleed" scheme involves a multi-layered web of misinformation aimed at blocking Continental Commons and devaluing Plaintiffs' Property so as to force Plaintiffs to abandon or sell the Property.  Defendants' actions were not based in patriotism or an altruistic desire to preserve American history.   Instead, their scheme is based in greed. Defendants' plan was entirely motivated by Defendants' desire to acquire the Property and create a tourist and cultural heritage destination.

43.     Despite any historical or archaeological evidence linking the Property and/or the burial area to the Revolutionary War, used the discovery of the burial area as the cornerstone of their strangle and bleed scheme.

44.     Defendant FOFSD is led by Defendant Lance Ashworth.  Defendant Ashworth has been a FOFSD board member since August 2009 and has served, and still serves, as the president of FOFSD, since January 2010.

45.     Defendant Ashworth's FBI status is universally known in the community.  It permeates all of his conversations and interactions regarding the Property.  Defendant Ashworth wields his FBI

status in a manner aimed at giving the FOFSD - and other participants in the fraudulent enterprise - credibility and to intimidate community members, local officials and Plaintiffs.

46.     Defendants' first attempted to acquire the Property in 2013.  It was then when Defendant Ashworth first contacted Plaintiffs about FOFSD acquiring the Property, Defendant Ashworth gratuitously introduced himself saying, "In my present line of work (I'm a federal agent)…my intentions are to be an honest and transparent partner to our interactions and expect the same of you. It's that simple."

47.     Unbeknownst to Plaintiffs at the time of this email exchange, Defendants had already begun to lay the groundwork for their fraudulent scheme.  Indeed, by the time of Defendant Ashworth's email, Defendants had already trespassed on the Property on several occasions, physically altered the Property, seeded the 19th century stone ruins and the north side of the Property with artifacts, seeded the burial trench and one of the southernmost graves and manipulated an archaeological report detailing a dig funded by Plaintiffs.

48.     Believing that he was engaged in an "honest" offer to buy the Property, in and around May 2013, Plaintiff Broccoli offered to sell the Property to the FOFSD, but required that the sale be completed by the end of 2013.

49.     Recognizing that FOFSD was unlikely to be able to raise the funds required to purchase the entire 10.4 acres, Broccoli offered to donate the 0.4-acre burial area and two additional acres of the Property to Defendant FOFSD.

50.     In furtherance of his good faith offer to donate the two acres and the burial area, Plaintiff began to solicit comments from Defendants Ashworth and Farrell on the design of Continental Commons.

51.     Defendant Ashworth, understanding the terms of the offer, attempted to obtain funding, including millions in federal grant money, to purchase the Property.  In or around December 24, 2013, Defendant Ashworth informed Plaintiff Broccoli that the FOFSD grant applications were denied and that they did not have the ability to purchase the Property.

52.     Plaintiff Broccoli informed Defendant Ashworth he would honor his original agreement and donate the two acres and the burial area to the FOFSD.  Defendant Ashworth declined stating, "That's not enough, we want the entire 10 acres."

53.     Having failed to purchase the Property, Defendants continued their fraudulent scheme, with a renewed focus of delaying and/or blocking Plaintiffs' efforts to develop the Property.

***Defendants' Deceptive Distortion of the Archaeological and Historical Record***

**A.      Defendants Knowingly Misrepresent the Relevant Archaeology and History in Greenhouse's 2009 Report and File Same with the NYSHPO**

54.     Though Plaintiffs did not and could not have known this until recently, the first known step in Defendants' fraudulent scheme to "strangle" and "bleed" Plaintiffs came in or around January 2009.   It was then that Defendants knowingly and intentionally misrepresented relevant archaeology and history to place features related to the Fishkill Supply Depot on Plaintiffs' Property.

55.     Plaintiffs first retained Greenhouse in the late 1990s to perform archaeological investigations in connection with Plaintiffs' prior hotel project on the northeast portion of the Property.   Greenhouse performed investigations on the Property in 1998, 1999 and 2000 concluding that "no evidence of Revolutionary War activities was found… [and] no evidence of any burials dating to the Revolutionary War or any other time period was seen [on the Property]."

56.     Plaintiffs' retained Greenhouse again in 2007 to perform the additional investigation required by SHPO.  It was during this investigation that the grave features were discovered in the southwest part of the Property.

57.      Although Greenhouse identified the human burial, it did not identify any artifacts that could be used to date the burial.  Greenhouse took no other steps to attempt to date or identify the remains found in the burial.

58.     Following the 2007 investigation, Greenhouse prepared a report.  The final version was finished in January 2009.

59.     Defendant Sandy was the contract archaeologist hired by Greenhouse to perform the 2000 and 2007 investigations and he co-authored the 2009 report.  Unbeknownst to Plaintiffs, Defendant Sandy was already affiliated with the FOFSD in 2008 at the time he was working on the Greenhouse report.

60.     Notwithstanding the lack of evidence identifying the human burial or linking the Property to the Revolutionary War, Greenhouse stated in the 2009 report that the burial was from the Revolutionary War.  Further, Greenhouse stated that the stone ruins and features on the northern portion of the Property outside of the burial area were related to the Fishkill Supply Depot. Greenhouse knew these statements to be false when it prepared the 2009 report.

61.     Once the 2009 Report was written, Defendants conspired to submit the 2009 Report to NYSHPO.  Defendants knew that Plaintiffs were not planning to submit the results of the investigation to the Town of Fishkill Planning Board until Plaintiffs submitted their development application.

62.     Despite the fact that Plaintiffs had not filed its development plan with the Town of Fishkill, and without sharing their conclusions with Plaintiffs (who paid in advance for the 2009 Report and

investigation), Greenhouse submitted the 2009 to Defendant Mackey at NYSHPO.  Greenhouse did so without authorization and/or consent from Plaintiffs.

63.     The filing of the Greenhouse Report with NYSHPO triggered a coordinated set of events that were critical to Defendants' "strangle" and "bleed" scheme and would become repeated obstacles to Plaintiffs' development efforts.

**B.     Defendants Cause a False Statement to be Included in Town's Comprehensive Plan**

64.     Indeed, following the filing of the 2009 report with NYSHPO,  Defendant Mackey, on behalf of the NYSHPO, sent a letter to Plaintiff Broccoli's former partner regarding a meeting they had earlier that day and without justification or cause copied the Town of Fishkill Board members. Indeed, Defendant Mackey copied the Town board members despite the fact that Plaintiffs had not submitted a formal development application to the Town.

65.     In the letter, Defendant Mackey knowingly and intentionally echoed the false information stated in the 2009 Report and misrepresented the results of a 2008 ground penetrating radar ("GPR") study performed in the burial area.  He did so to support his recommendation that the entire Property be preserved and that hundreds of Revolutionary War soldiers were buried on the Property.

66.     Defendant Mackey's letter to the Town of Fishkill justified an amendment to the newly adopted Town's Comprehensive Plan which called for the need to preserve the Fishkill Supply Depot.

67.     Under the heading, "Preserve and commemorate significant historic and archaeological structures and sites," the Comprehensive Plan was amended to state that the Town's objective was to "Work with representatives of New York State, the Federal government and interested parties to purchase or otherwise preserve portions of the historic Fishkill Supply Depot lands that remain

undeveloped and explore how these lands can best be used to commemorate the activities that occurred on these hallowed grounds, especially those lands where gravesites of former soldiers have been identified."

68.     While the Comprehensive Plan does not specifically identify Plaintiffs' Property by name or address, Defendants, relying on the false statements in the 2009 Report and Defendant Mackey's letter, convinced local officials to include this language in the Comprehensive Plan.  This language has been interpreted by Defendants to refer specifically to Plaintiffs' Property and has been cited by Defendants as a basis to legitimize their preservation effort; their fundraising; and to block Continental Commons.

**C.      Defendants Falsely Characterize Plaintiffs' Property as "Untouched" Land**

69.     Another key component of Defendants' scheme is their repeated claim that the Property has been "virtually untouched since the Revolution."  Defendants included this false statement in the 2009 report and in countless statements opposing Continental Commons.  This is one of the ways Defendants attempt to mislead the public into believing the Property is different than the thousand other parcels that were part of the greater Fishkill Supply Depot.

70.     The false claim that the Property has been untouched since the Revolution is necessary for Defendants' fraudulent scheme to distort the archaeological and historical record.   By misinforming the public with claims the land has been untouched since 1783, Defendants transform everything, and anything found on the Property, including the stone features, ruins/structures and graves into artifacts of the American Revolution.

71.     Indeed, because Defendants ongoing deception of the public includes the "untouched" since the Revolution claim, every brick, rock formation, broken dish, mounds of dirt, bone, burial

feature, barn, stable, horse related artifact, and animal carcass becomes a Revolutionary War discovery that advances the fraudulent scheme to "strangle" and "bleed" Plaintiffs.

72.     There is no doubt that Defendants made these statements knowing that they were false. The record is clear that the Property has been extensively used and developed over the last 200 years.

73.     For example, the Property contains a 19th century farmhouse/barn and was farmed before and for almost 200 years after the Revolution, including vegetation clearing, plowing, construction of large and small agricultural outbuildings and an associated road network during the late nineteenth and early twentieth centuries.

74.     Additionally, in the mid-1960s two modern homes with basements, septic systems and leaching fields were built on the Property.  These homes were occupied when Plaintiffs bought the Property in 1986 and demolished in 1999 when NYSHPO, approved the construction of a gas station, convenience store and car wash on a one-acre parcel subdivided from the northwest portion of the Property.  In the 1980s Defendant Mackey worked at the Van Wyck Homestead which sits directly across the road from the Property.  He undoubtedly was aware of the 1960s homes as well as the archaeology and history of the area.  Notwithstanding his extensive knowledge, Mackey knowingly accepted the false information contained Greenhouse 2009 report without comment regarding the mischaracterization of the Property's use and previous archaeological investigations. He admitted in a January 13, 2021 affidavit that there was activity on the Property after the Revolution.

**D.     Defendants Falsely Claim Property Contains Largest Revolutionary Cemetery**

75.     Despite their knowledge that the human remains or the other suspected human burials have not been dated and/or linked to the Revolutionary War, Defendants have repeatedly claimed that

the Property holds the largest Revolutionary soldier's cemetery in the Country.  They made these statements knowing it would cause injury to Plaintiffs and delay the development of the Property.

76.    As recently as 2019, during a fundraising event, Defendant Ashworth stated that eight graves were excavated during the 2007 archaeological dig and that buttons and shreds from Continental Army uniforms were discovered.

77.    Defendants know that this statement is false.  Eight bodies were never discovered at the Property and at no time were the human remains of the single grave ever examined, let alone examined sufficiently to date the remains.  Defendants know this but made the statement to the local press to injure Plaintiffs and Plaintiffs' development of the Property.

78.    Defendants did not just make unsubstantiated statements but also knowingly and intentionally misrepresented archaeological investigations and published false statements to support their statements.  They did so with the intent of causing harm to Plaintiffs and Plaintiffs' business opportunities.

79.    For example, Defendants have knowingly misrepresented the findings of the 2008 GPR study to further their lie that the largest Revolutionary War soldier cemetery exists on the Property. In doing so, Defendants have repeatedly and intentionally misled the public, Town of Fishkill officials and state and federal officials, including Senator Charles Schumer, about the Property possessing confirmed graves and features from the Fishkill Supply Depot.

80.    Defendants claimed that "anomalies" referenced in the GPR study represented 320 individual soldiers' burials.  Defendants, who include Defendant Sandy, a Registered Professional Archaeologists, know this statement to be false.

81.    Defendants knew their statements regarding the GPR study were false.  Defendant Sandy solicited and received an interpretation of the GPR study from renowned GPR expert Dr. Bruce

Bevan.  Dr. Bevan refuted Defendants' premise.  Dr, Bevan made clear that the GPR study was not conducted to identify individual graves, but only to identify the boundary of the potential burial area in the south portion of the Property.  Additionally, on or around January 30, 2015, Defendant Sandy received an email from Tim Lloyd at NYSHPO, who had reviewed Dr. Bevan's analysis and agreed that the goal of the 2008 GPR study was "to define the cemetery boundary, and not to identify every specific grave location."  Even after their interactions with Dr. Bevan and Lloyd, Defendants continued to knowingly misrepresent the GPR study.

82.    Defendants have also published knowingly false statements on the website of the FOFSD. For example, a 2013 FOFSD press release - which is still on the group's website - states:

> "Historical Research conducted by the not-for-profit organization Friends of the Fishkill Supply Depot (FOFSD) has identified the names of 9 additional soldiers believed to be buried in unmarked graves at the Soldiers' Cemetery in Fishkill, NY. These new findings bring the total number of soldiers identified to 34. The Soldiers' Cemetery was rediscovered in 2007 by archaeologists whose efforts revealed that hundreds of graves are present, making FSD the largest single burial ground of the war Defendants know this statement to be false, but continue to publish the statement to cause injury to Plaintiffs.

*****

> One remaining, undisturbed parcel of the original FSD is privately held and in danger of commercial development; it contains not only the Soldiers' Cemetery but other identified ruins. Ongoing historic research conducted by FOFSD has disclosed that the graves of the following Revolutionary War heroes are located in this parcel:

| | |
|---|---|
| William Benson | Pvt. in Eduard Lounsbery's 2nd NY Regt; died 10/10/1778 |
| John Bryan | Pvt. in the 2nd Maryland Regt of Foot; died bet 11/1778 - 12/1778 |
| Samuel Chatfield | Pvt. in Col. Goose Van Schaick's 1st NY Regt; died 10/24/1778 |
| Josiah Comstock | Pvt. in 3rd New Hampshire Regt; died 1/18/1779 |
| Robert Downs | Served in 2nd New Hampshire Regt; died 1/1/1779 |
| David Fellows | Lt. in Hazen's Regt; died 12/10/1779 |
| Joseph Fenton | Lt. in 13th Mass. Regt; died of wound 3/29/1780 |

| | |
|---|---|
| Henry Glover | Probably from Hillsborough, NH; died 11/1779 |
| Jacob Grover | Served in 10th Pennsylvania Regt; died 9/22/1778 |
| Abraham Godwin | Marine Cpt. of the Lady Washington; died of wound 2/9/1777 |
| Henry Godwin | Cpt. 5th NY Regt; died 3/10/1782, buried near his father Abraham |
| Jesse Higgins | Pvt. in Cpt. Samuel Wylly's 3rd Connecticut Regt; died 11/27/1778 |
| Abner Hill | Pvt. in the 2nd Maryland Regt of Foot; died bet 11/1778 - 12/1778 |
| Charles Hubbard | Pvt. in the 2nd Maryland Regt of Foot; died bet 11/1778 - 12/1778 |
| Nathaniel Johnson | Army Nurse; died in service of Smallpox |
| William Johonnot | Asst. Surgeon General at Fishkill's Hospital, drowned about 5/13/1782 |
| Jonathan Judgkins | Pvt. in 1st New Hampshire Regt; died 3/4/1778 |
| Isaac Ketchum | Pvt. in Cpt. Titus' 4th NY Regt; died 7/21/1777 |
| Levi Lampre (Lampory) | Sgt. in 3rd New Hampshire Regt; died 11/10/1779 |
| Alexander McArthur | 2nd Lt. 5th NY Regt; died 10/8/1782 |
| Nathaniel Needham | Pvt. in 2nd Co., 1st Battalion New Hampshire; died 1/2/1779 |
| Benjamin North | Lt. in Col. John Lasher's Regt; died 3/28/1777 |
| Simeon Pearl | Served in 2nd New Hampshire Regt; died 2/10/1779 |
| Francois Pelland | Lt. under Col. Moses Hazen; died 10/1778 |
| Samuel Perry | Pvt. in 3rd New Hampshire Regt; died 6/1/1779 |
| Zekry Prince | Pvt. in Col. Samuel Wylly's Connecticut Regt; died 2/1779 |
| Mark Rowe | Served in Col. Jackson's Regiment (Mass.); died 3/8/1778 |
| James Sage | Pvt. in 16th Massachusetts Regt under Col. Lee; died 6/19/1778 |
| Robert Skinner | Served in Col. Thomas Marshall's MA Regt; died 4/14/1779 |
| Asa Stone | Pvt. in Col. Cushing's Massachusetts Regt; died 12/20/1777 |
| Joseph Storer | Served in Cpt. Blaisdel's Company, E. Wigglesworth's Regt; died 1777 |
| Hugh Thornton | Pvt. in 1st New Hampshire Regt; died 2/1778 or 3/1778 |

| Archelaus Towne | Cpt. and scout under General Gates; died 12/1/ 1779 |
| James White | Pvt. in 3rd New Hampshire Regt; died 1/20/1778 |

A Copy of the March 16, 2013 FOFSD Press Release is annexed hereto at Exhibit A.

83.     Defendants know that none of the soldiers listed in the March 16, 2013 Press Release are buried at the Property.  In fact, Defendants are aware of evidence that these individuals are buried elsewhere in Fishkill.  For example, in the book, *A Brief History of Trinity Episcopal Church*, it is documented that Captain Abraham-Godwin is buried in a church yard at Fishkill beside his father.

84.     Defendants use the FOFSD to include photographs of wreaths to further their lie that both Godwin's are buried on the Property.  According to media reports, Defendants have also contacted Captain Godwin's descendants and told them their ancestors are buried on Plaintiffs' Property

85.     As a result of Defendants' decade long misinformation campaign, the Property has become synonymous with the Fishkill Supply Depot even though the Depot included much of the town and some of neighboring towns during the American Revolution.

86.     Most recently, Defendants announced the names of the eighty-ninth and ninetieth Revolutionary War Soldiers they claim are buried on the Property.

87.     The announcement by Defendants of the "discovery" of a new soldier nearly always includes a solicitation to donate to the FOFSD.

88.     Defendants have told potential donors, the public and town officials that those soldiers are all together in one final resting place on the Property and that donating to Defendants will help preserve that land.  But Defendants know they are deceiving the public.  In a recorded conversation on January 30, 2015, Defendant Ashworth and FOFSD chief researcher Judy Wolf acknowledge that the Property does not contain hundreds of soldiers' graves.  Instead, they rationalize the false claim by saying that if all the Revolutionary War soldiers buried in graves in three church cemeteries throughout the Town Fishkill, including those in the mass burial at the nearby Rombout

Cemetery, were added up with those buried on Plaintiff's property, it might make the sprawling town of Fishkill home to the most Revolutionary War soldier's burials.

89.    This private concession is in direct contradiction with what Defendants tell the local, state and federal governmental entities, the media and potential donors.   Defendants explicitly tell donors that the Property holds the largest Revolutionary War burial and that donating to FOFSD will go toward purchasing the property and to preserve that burial area.

90.    Defendant encourage donations with knowingly false statements:

- "With each new name that is identified, we revisit the history and honor of this sacred site."  (December 1, 2012 FOFSD Press Release);

- "It's apparent that the hundreds of burials first identified by ground-penetrating radar in 2007 are quickly becoming corroborated by our group's research." In 2015, NYSHPO told Defendant Ashworth and the FOFSD  that the issues of "how many graves (multiple burials), who is buried (soldier or civilian) and what is the extent of the burial site remain unanswered in the material that our office has on hand."

91.    So as to legitimize their false claims about the Property and to further injure Plaintiffs, Defendants registered the Property on public websites as a Revolutionary War Cemetery.

92.    For example, Defendants register the Property on the website www.findagrave.com, a website that allows users to search for the graves of ancestors and famous people from around the world.

93.    Findagrave.com identifies the Property as "the largest single burial ground of the Revolutionary War."   The website also contains the following false statement, written by Defendants:

In 2007, archaeologists confirmed what local historians could not: the existence of a Continental Army burial ground where at least 300 soldier lie forgotten in unmarked graves upon land once known as the Fishkill Supply Depot. … Unfortunately, this single parcel of undisturbed land was found to be privately-owned and slated for commercial development.  At risk was not only the soldier's cemetery (the largest burial ground of the Revolutionary War_ but other identified ruins.

22

94.     Similarly, Defendants registered the Property on Google Earth as a "Historic Landmark in Dutchess County.  Defendants falsely registered the "Fishkill Supply Depot Burial Ground," and the "Fishkill Supply Depot Historical Site" as being located on the Property.  Further, Defendants uploaded photographs of the Property with the knowingly false caption "Fishkill Supple Depot Historical Site" and "Historical landmark in Dutchess County, New York."

95.     Defendant Ashworth unabashedly admitted that the Defendants listed the Property on findagrave.com and that Defendants "flooded the web" with similar false statements regarding the Property.

**E.     Defendants' Manipulation and Seeding of Plaintiffs' Property**

96.     Notwithstanding the Defendants' success in convincing others to believe that a Revolutionary War soldier's cemetery is on the Property, Defendants knew that if Plaintiffs ever attempted to develop the Property  Defendants' claims regarding the presence of additional graves would quickly be refuted.  Throughout the relevant time period, Defendants repeatedly entered Plaintiffs Property.  They did so to seed the Property with artifacts and to physically alter the Property so as to make it appear that additional grave shafts existed on the north side of the Property and that the Property was related to the Fishkill Supply Depot.

97.     Defendants' tampering with the Property is well documented.  Defendants have repeatedly entered the Property without authorization.

98.     For example, Defendants have long claimed publicly that while on the Property, Defendant Sandy discovered a Continental Army shoe buckle along the side of the burial trench.

99.     Upon information and belief, Defendant Sandy seeded the Property with the buckle to cause injury to Plaintiffs.  Indeed, the area in which he claims to have discovered the buckle had been extensively studied, including screening of 100% of the soil from the burial trench in 2007.

100.    However, after soliciting an opinion from the West Point Museum regarding the nature of the buckle, Defendant Sandy was informed the artifact was a common man or women's shoe buckle, not that of a Revolutionary War soldier. Sandy quickly relayed the opinion back to Defendant Ashworth.

101.    Despite knowing that the buckle is not Revolutionary War-era, Defendants continue to claim that it is from a Revolutionary War soldier uniform to support their "strangle" and "bleed" scheme and to solicit donations.

102.    Defendants have also physically altered the Property.  For example, Defendants entered the north side of the Property and dug holes in the shape of grave shafts in the area to be developed as a hotel to fabricate "anomalies."  Defendants used the FOFSD to trick unsuspecting members of the community, including a local boy scout troop, to assist in their manipulation of the Property.

103.    Once the "anomalies" were fabricated, Defendant Mackey, who had previously stated that there was no evidence of graves on the north side of the Property - ordered, without justification, that an additional GPR investigation be conducted in the area that was manipulated by Defendants. Plaintiffs paid for this second investigation.

104.     Defendants succeeded in their plan to confuse the archaeology when the second GPR survey, conducted in 2012 by Radar Solutions International, detected sixteen anomalies that resembled the shape and depth of the burial features discovered by Defendants Sandy and Greenhouse in 2007.

105.    The archaeologists who identified these "anomalies," suspecting that they may be grave shafts excavated three of the sixteen anomalies.  The sixteen anomalies were within the two-and-a-half-acre area where the hotel was approved in 2000.  After examining the anomalies, Plaintiffs' consultants determined that the anomalies were recently dug.  The anomalies contained organic

material which would not be found in a historic grave.  The anomalies were determined to be dug to a depth and size similar to the grave features found previously in the burial area in 2007.

106.    As part of the archaeology team that discovered the graves in 2007, Defendant Sandy knew the exact dimensions, shape and depth to which the anomalies would need to be dug so as to resemble human burials.

107.    In addition to physically altering the north side of the Property, Defendants have also seeded the Property.

108.    By 2013, more than thirteen archaeological investigations had been conducted on the Property.  Including the 2007 investigation performed by Greenhouse, which found a human burial, none of the other investigations identified human remains on the Property.

109.    In and around May 2013, however, an additional investigation was being performed in the burial area under the supervision of Defendant Mackey and NYSHPO.  Other than Defendant Mackey, none of the other defendants were officially involved in the investigation.

110.    Large trenches were dug on or around May 7 and 8.  While the trenches were dug, no artifacts or human remains were discovered.  The trenches were left open and unsupervised overnight.

111.    On May 9, 2013, archaeologists discovered human bones conspicuously sticking straight out of the walls of the trench in the burial area.  The shallow human remains were not discovered at the time the trench was dug.  The bones were not in a grave feature.  Instead they were in the shallow soil in the burial area.

112.    Despite this discovery, which could suggest the presence of a mass burial, Defendant Mackey did not order the continued investigation of the alleged displaced bones.  Instead, breaking

from NYSHPO protocol, Defendant Mackey curiously ordered that the trenches be filled in and the bones buried.

113.    In 2018, Plaintiffs learned that Defendant Mackey knew that Defendant Sandy would be visiting the Property on the morning of May 9, 2013 before the work was to resume.  Upon information and belief, Defendants seeded the trench with these shallow bones.

114.    Indeed, the very next day (May 10, 2013) Defendant Sandy was speaking about the presence of a "mass burial" that was discovered on the Property.

115.    Later that year, in September 2013, Defendant Sandy again was speaking about a mass burial on the Property.  This time he referenced the "shallow bones" discovered in the burial area, including the depth and location at which the shallow bones were discovered.  This, despite the fact that the discovery of the shallow bones was not reported or made public until mid-2015 when Plaintiffs submitted their development plan to the Town of Fishkill.

116.    Plaintiff Broccoli was present during the work performed in May 2013.  Plaintiff Broccoli took video footage of the work, including the trenches in the burial area, using a personal camera. In July 2013, that camera, which also contained footage of the 2007 Greenhouse dig, was stolen from his personal car while it was parked at his home.  Broccoli reported the robbery to the local police department, who explained that it was an isolated robbery.

117.    Video footage that was on the stolen camera has been posted on Facebook pages known to be operated by Defendants.

118.    Defendants have also seeded the Property with metal objects.  A 2020 GPR study and metal detector survey performed by Radar Solutions International revealed well-preserved or recently placed modern metal objects on the Property, including those placed in a recently disturbed grave feature on the southernmost end of the 2007 burial area trench.  Both the volume and placement

of the metal objects suggests that the metal was intentionally placed, and not there as a result of prior use of the Property.

**F. Defendants' Hunter Report**

119.    After Plaintiffs submitted their development plan with the Town of Fishkill, Defendants ramped up their efforts to block Continental Commons and injure Plaintiffs. Defendants' efforts to intentionally misrepresent the archaeological and historical record culminated in the preparation of a report known as the "Hunter Report," which was filed with the Town of Fishkill in opposition to Plaintiffs' development proposal.   The Hunter Report intentionally misrepresented the archaeological and historical record so as to link the Property to the Fishkill Supply Depot.  The Hunter Report was prepared by Defendants with the intent to injure Plaintiffs.

120.    Defendants applied for and received a National Parks Service American Battlefield Protection grant for $24,600 to compile the archaeology studies that had been done on and around the immediate area of the Property into a single Report. Through FOFSD, Defendants hired Defendant Hunter Research, Inc., which is led by Defendant Richard Hunter a Registered Professional Archaeologist. In July 2016 Defendant FOFSD submitted the 2016 Hunter Technical Report to the Town of Fishkill Planning Board and NYSHPO during the Town's consideration of Continental Commons.

121.    Defendants repeatedly characterized the Hunter Report to the Town and the public as an "independent" report prepared under the auspices of the National Park Services.  In reality, the Hunter Report was an advocacy piece prepared by Defendants.

122.    Indeed Plaintiffs would later learn that Defendant Ashworth supervised the preparation of the Hunter Report.  Defendant Sandy was the paid archaeological consultant and FOFSD members

27

Martin "Marty" Byster and Judy Wolf provided historical research and data used in the report. Defendants did not disclose their involvement with the Hunter Report to the Town of Fishkill.

123.   In preparing the Hunter Report, Defendants intentionally misrepresented the historical and archaeological record with respect to the Fishkill Supply Depot and the Property.

124.   To bolster Defendants' claim that the Property contained the largest Revolutionary War cemetery, the Hunter Report falsely stated that in 2010 human remains (shallow bones) were discovered in an excavated utility trench on the Maya Café Restaurant property immediately south of the Property's burial area.  The Hunter Report cites an "anonymous source" for this purported discovery.

125.   At no time was the purported discovery of bones ever reported to the owner of the neighboring property or Landmark Archaeological, the company who performed the 2010 investigation.  Nor was NYSHPO, the Town, the county, or the press alerted to this alleged discovery of bones.  In fact, the 2016 Hunter Report is the first known account of the discovery of human remains in 2010.

126.   Defendants have repeatedly made knowingly false statements that the human bones were discovered on the Maya Café property.  They make these statements about Maya Café because of its proximity to the Property.

127.   Defendant Hunter was hired to compile and synthesize the existing archaeological reports of the Property.  Without putting a shovel in the ground and without notifying any government entities or stakeholders, Defendant Hunter "found" bones in the parcel adjacent to the Property based on mere hearsay.  The "discovery" of the bones supports the fundamental claim of Defendants.  Defendants, who demanded that the Maya Café be investigated, knew that no human remains were identified.  Still, Defendants repeatedly pointed to the "discovery" of bones at the

Maya Café to bolster their claim that a mass burial of soldiers expands from Plaintiffs' Property, under the road and on to the Maya Café property.

128.    The Hunter Report also falsely states that there were grave shafts discovered on the northeast side of the Property in the year 2000 during the Greenhouse's archaeological investigation.   None of the archaeological studies Defendant Hunter Research Inc., review included that information.

129.    The Hunter Report also falsely identifies Hartgen Archaeological Associates, Inc., who advised Plaintiffs in connection with Continental Commons, as the source of the information regarding the discovery of shallow bones at the Maya Café and that grave shafts were discovered on the northeast of Plaintiffs' Property in 2000.

130.    In addition to the Hunter Report, Defendants also prepared a 12-page presentation booklet under Defendant Hunter Research's name.   The presentation booklet was so vital to the Defendant's misinformation and fundraising campaign that Defendant Ashworth suggested having contacts at the state prison print an additional 500 to 1,000 to distribute to the public including local elected officials and donors.

131.    Defendants knew that because the Property and Maya Café are on the National Register of Historic Places, Defendants' figurative planting of bones would cause considerable injury to Plaintiffs by delaying and/or blocking the approval of Continental Commons.

132.    The Hunter Report also downplayed other significant locations in Fishkill, which actually contain known Revolutionary War burials.   For example, at the time the Hunter Report was filed with the Town of Fishkill, the application for the development of a commercial storage facility was before the Town.

133.    The proposed storage facility was across the street from the historic Brinkerhoff Home and a known Revolutionary War cemetery.  Notwithstanding that the proposed project was on a parcel known to be part of the Fishkill Supply Depot, and in fact untouched since the Revolution, the Defendants did not call on the Town to require a single archaeological investigation at the site.

134.    So as to bolster their claims that the Property is a Revolutionary War cemetery, the Hunter Report intentionally eliminated any reference to the historical sites near the storage development project.

135.    On June 5, 2019, at the end of the Town of Fishkill Planning Board meeting broadcasted on local cable television, Plaintiffs' legal and archaeological team publicly disputed Defendants' claim that the Property is part of the largest soldiers' burial area.  Plaintiffs demonstrated that Defendants coauthored both the 2009 Greenhouse and the 2016 Hunter Reports and figuratively manufactured grave shafts on the north side of the Property.   Plaintiffs used photographs of Defendants during a 2010 event, where they were digging on the Property.

### *Defendants' Information Laundering*

136.    Lacking legitimate archaeological records to support their claims about the Property, Defendants resorted to using mass media and social media to create an urban legend about the Property containing Continental Army ruins and the largest soldiers' cemetery in the country and that the Property has not been adequately studied.

137.    For example, in a December 9, 2012 article Defendant Ashworth stated that seven bodies were examined more closely to date them from the period of the American Revolution.  This statement is false.

138.    Similarly, Defendant Ashworth routinely claims, as he did in an April 30, 2016, Poughkeepsie Journal article that the Property has never been studied "in earnest."  In fact, it is one of the most archaeologically studied properties in Dutchess County.

139.    News reports repeating Defendants' false claims continue to appear in the New York Times, Gannett Newspapers, New York Post and many other print and online news outlets.  Over the past decade, Associated Press wire stories repeating the false claim of a massive Revolutionary War soldiers' cemetery in Fishkill endangered by Plaintiffs were syndicated and appeared in hundreds of newspapers around the world.  Defendants then used social media to amplify the information they had laundered.

140.    Defendants' misinformation campaign has been so effective that on June 1, 2009, Senator Schumer visited the property and introduced legislation in the United States Senate to make federal preservation funds available to Defendant FOFSD.

141.    Schumer invited Defendant Mara Farrell, public relations professional and cofounder of the FOFSD, to testify before the Senate Subcommittee on National Parks on July 13, 2009. Defendant Farrell testified before Congress and made knowingly false statements regarding the archaeology and history of the Property.

142.    For example, Farrell made the following knowingly false statements::

> "At the endangered National Register Fishkill Supply Depot, recent archaeological surveys have revealed a large Continental Army Cemetery Complex and the remains of additional features associated with the depot. **Hundreds of graves have been sited on one portion of the undeveloped acres within this historic district - a portion currently on the market and threatened with strip mall development**."

> "And so I come here today to speak for the hundreds of veterans and founding fathers buried here, in unmarked graves facing east, within the boundaries of this great American heritage site - and **I come with the hope that critical funding and protection will become available through the American Battlefield Protection Program**."

31

"Historians believe that hundreds, if not thousands, of Continental Army soldiers who sacrificed their lives and died from war wounds, hypothermia, dysentery, small pox and other diseases are buried at the Depot Complex, in what has long been termed an "unknown" location. **Today, of course, the big news is that finally this location is no longer "unknown". Through rigorous archaeological testing and remote sensing, the location of the Continental Army Cemetery Complex, which again I state could well be the largest ever identified in United States history, has been confirmed**. And it is located at the precise site where new construction was to begin for a strip mall. The archaeologists on-site the night the first graves were discovered, describe the experience as deeply emotional and heart-wrenching."

143.    Of course, no such "rigorous archaeological testing and remote sensing" was ever performed to confirm the existence of a Continental Army Cemetery.  Defendant Farrell knew that at the time she testified.  Defendant Farrell made these statements with the intent to injure Plaintiffs and to support Defendants' efforts to obtain federal funding to support their "strangle" and "bleed" scheme.

144.    The press release put out by the Senator's office incorrectly restates Defendants' unsupported claims about the Property.  Specifically, the release states, "Recent archaeological investigations and ground penetrating radar scans have located hundreds of graves, dating back to the 18th century, and it is anticipated that the number of graves on the site could be more than 1,000."  In fact, no graves have been dated, let alone back to the Revolution.

145.    The Schumer press release took Defendants' information laundering campaign to a new level.  Now the senior United States Senator from New York legitimized Defendants' claims for them.

146.    Publisher HarperCollins and author Marilyn Johnson fell victim to Defendants' information laundering. In 2014 they published a best-selling book on archology titled *Lives in Ruins*.  In September 2012 Defendant Sandy was videotaped misleading the author Marilyn Johnson about the 2008 and 2012 GPR studies and archaeology conducted on the Property when

he can be heard telling Johnson that the 2012 GPR study detected additional graves on the north side of the Property.

147.    The book included an entire chapter on these false claims.  Plaintiffs contacted publisher HarperCollins regarding the archaeology and historic claims in the chapter about the Property. *Lives in Ruins* had to be amended and a footnote added after Plaintiffs demonstrated to the Publisher that it included unsupported propaganda about Revolutionary War soldiers from Defendants.

148.    Though only one of 15 chapters in the book covers the Property, the Washington Post review of the book highlighted the Property and unwittingly perpetuated Defendants' information laundering campaign.  The review states falsely, "In Fishkill, N.Y., contract archaeologist Bill Sandy discovered 'the largest cemetery of Revolutionary War soldiers in the country,' which seven years later still sits unexcavated, because the owners want $6 million for the land and there are no federal funds for purchasing it.  Sandy gives tours and talks about the site, while a private organization tries to raise money to buy it."

149.    Johnson was deceived by Defendants.  She shared a FOFSD member's social media post saying, "Thursday night in Fishkill. Let's talk about the largest burial ground of Revolutionary War Soldiers yet found- and still not preserved."

150.    Defendants also sought to influence government records through their misinformation campaign.  David Moyer of Birchwood Archaeological Services was hired by the Town of Fishkill, Village of Fishkill, and neighboring municipalities to review the Phase IA/IB cultural resource survey for the proposed New York Route 9 Water Main System Improvement Project.  Defendant Sandy deceived Moyer and the deception became part of the official report Moyer provided to the Village.

151.    Moyer mentions in his report that the graveyard on the grounds of the Fishkill Supply Depot (Moyer is referring to Plaintiffs' Property) is a short distance from the Van Wyck Homestead.  It goes on to say, "This graveyard was 'discovered' during archaeological digs in the spring of 2007.  It is the largest Revolutionary War Continental Army burial site, and hopefully the ten acres surrounding their graves will be preserved as a historic site."

152.    When provided with documentation from NYSHPO and other sources by Plaintiffs, Moyer amended the study and wrote a letter explaining, "In putting together the Historic Overview section for the Village of Fishkill Water System Improvement Project Cultural Resource Survey we used archaeological information provided to us by William Sandy, an archaeologist and advisor to the Friends of the Fishkill Supply Depot."  The letter from Moyer concluded, "The revised version of the Town and Village of Fishkill Water System Improvement Project Cultural Resource Survey which we have submitted to the NYSHPO, eliminates the incorrect, misleading and inappropriate statements in the original version of our report."

153.    Defendants also suppressed information that did not support their position that Plaintiffs' Property was the site of a mass burial.

154.    Defendants successfully lobbied the Town and Dutchess County to fund a "round table," where local individuals, businesses and preservation groups could collaborate.  At the round table event, representatives from the Rombout Rural Cemetery, who attended the event suggested that Rombout may be the site of the mass soldiers burial that Defendants claimed was on the Property and were in search of funds to conduct a GPR survey to find the lost soldiers.

155.    As this information did not support their claims that the Property was the location of the soldiers' mass burial, Defendants suppressed and publically disputed any suggestion that Rombout was the location of the mass burial.

*Defendants' Fraudulent Fundraising*

156.    Defendants have used their intentional and knowingly false statements as the basis for their fundraising efforts.  Defendants have used the monies received to support their "strangle" and "bleed" scheme and for their own financial gain.

157.    In 2014, as a gesture of good faith and patriotism, Plaintiffs placed a marker in the burial which honors Revolutionary War.  Although the seven grave features that were discovered have never been dated or confirmed to contain remains of Revolutionary soldiers, Plaintiffs informed NYSHPO that the southwest 0.4-acre portion of the Property would be permanently preserved and would never be developed.

158.    Preservation of the small burial site has been completed by Plaintiffs.  Defendants know that it has been preserved.  Yet Defendants, as of the filing of this complaint, continue to fundraise based on the stated need to preserve the burial area.

159.    Defendants, using the false statements about the Property, lobbied Senator Schumer to change the National Park Service grant eligibility to include non-battle related Revolutionary War sites.  This allowed Defendants, through the FOFSD, to obtain federal grants to fund their "strangle" and "bleed" scheme.

160.    Based on the false claim that the "largest Revolutionary War soldier's cemetery in the country" is on the Property, Defendants applied for and received a United States Department of the Interior National Parks Service American Battlefield Protection Program (ABPP) grant for $24,600.  The grant was used to pay for the Hunter Report.  Defendant Sandy received ten percent of the funding for managing and consulting on the Hunter Report with Defendant Hunter Research Associates  receiving the balance.

161.    Based on the false claim that the "largest Revolutionary War soldier's cemetery in the country" is on the Property, Defendants applied for and Received Hudson River Valley National Heritage Area grant for $1,200.

162.    Based on the false claim that the "largest Revolutionary War soldier's cemetery in the country" is on the Property, between 2012 and 2015, Defendants applied for and received $6,930.00 from the New York Council for the Humanities.

163.    Based on the false claim that the "largest Revolutionary War soldier's cemetery in the country" is on the Property, Defendants received a $250 donation from Semper Fi Parents of Hudson Valley a 501 (c) (3) that supports military families and veterans.

164.    Based on the false claim that the "largest Revolutionary War soldier's cemetery in the country" is on the Property, Defendants received a donation from the Dutchess Land Conservancy.

165.    Based on the false claim that the "largest Revolutionary War soldier's cemetery in the country" is on the Property, Defendants received a donation from Daughters of the American Revolution Workshop, NY.

166.    Based on the false claim that the "largest Revolutionary War soldier's cemetery in the country" is on the Property, Defendants received a donation from Daughters of the American Revolution James Madison, NY.

167.    Based on the false claim that the "largest Revolutionary War soldier's cemetery in the country" is on the Property, Defendants received a donation of $5,000 from Defendant Sherry.

168.    Based on the false claim that the "largest Revolutionary War soldier's cemetery in the country" is on the Property, Defendants received a donation of $10,000 to FOFSD "Legal Defense Fund' from according to Defendants "an individual who wishes to remain anonymous."

169.     Based on the false claim that the "largest Revolutionary War soldier's cemetery in the country" is on the Property, Defendants received donation of $2,000 from IBM.

170.     Based on the false claim that the "largest Revolutionary War soldier's cemetery in the country" is on the Property, Defendants received a $1,000 contribution from Hyatt House Hotel Fishkill.

171.     Based on the false claim that the "largest Revolutionary War soldier's cemetery in the country" is on the Property, Defendants received a $250,000 donation.  According to Defendant Ashworth's email to FOFSD members, the donation was from a "NYC-based individual."

172.     Based on the false claim that the "largest Revolutionary War soldier's cemetery in the country" is on the Property, Defendants applied for National Trails System Land and Water Conservation Fund grant of $3,000,000.  The application was denied.

173.     Based on the false claim that the "largest Revolutionary War soldier's cemetery in the country" is on the Property, Defendants have requested $650,000 in state grants.  These applications have been denied.

174.     Based on the false claim that the "largest Revolutionary War soldier's cemetery in the country" is on the Property, on May 4, 2016, Defendants sought matching funds of $600,000 from the Town of Fishkill to buy a parcel of land adjacent to the Property.  The application was denied when the owner of the parcel, informed the Fishkill Town Board at a publically televised meeting that he had never spoken with, Defendant Ashworth or any member of the FOFSD and stated that there was no plan to sell the Property to Defendant FOFSD.

175.     As of the filing of this Complaint, Defendants, through the FOFSD, are actively pursuing donations from the US Military Academy at the West Point alumni website West-Point.org using knowingly false information about the Property.  The headline on the donation page currently

reads, "Honor our nation's earliest heroes by saving the largest Revolutionary War burial site ever identified."

176.    Defendants, through the FOFSD, also exploited the not-for-profit Wreaths Across America for financial gain.  To participate in Wreaths Across America annual laying of wreaths on veterans' graves and receive the revenue of $5.00 per wreath sold, FOFDS falsified their application. FOFSD's application misidentified the true owner of the parcel as Steve Lynch and claimed that the owner of the property gave permission to use the property.  Most appalling, the application asserted that the cemetery contains 400 identified veterans' graves.

177.    Defendants' fraudulent fundraising operation is not limited to private donors.  Through the FOFSD, Defendants have attempted to defraud local, state, and federal taxpayers of more than $3,000,000.00.  For example, Defendant Ashworth misrepresented archaeological evidence when completing applications to the National Parks Service and the New York State Economic Development Council.

178.    Incredibly, Defendants continue to use the FOFSD to fundraise on the false claim that the FOFSD is raising money to purchase the Property.  The Property has not been for sale since 2013 and Plaintiffs have explicitly stated that the Property will never be sold to Defendants.

179.    For example, the following communications were sent by interstate mail or commercial carrier, by Defendants, or at their behest and with their express authorization, and/or consistent with reasonable expectations, contained knowingly false statements, misrepresentations, and misleading omissions.



180.   Defendants sent the fundraising request with the intent to raise money to continue their "strangle" and "bleed" scheme.

181.   Defendants also used interstate wire services in furtherance of their strangle and bleed scheme.  This included the use of email communications and money transfers from and between Defendants and members of the FOFSD.  For example, the following communications were broadcast or distributed using interstate wire services or other interstate electronic media by Defendants, at their behest, with their express authorization, or consistent with reasonable

expectations, and which involved the knowingly false statements, misrepresentations, and misleading omissions:



182.    Each of these uses of interstate wire services were made with the intent to encourage financial donations to raise money to fund the Fraudulent Scheme.

### *Defendants' Tampering with Town Government*

183.    In a recorded conversation on January 30, 2015, Defendant Ashworth states that his plan to preserve the Property must be fought on the "political front." He tallies which federal, state, and local elected officials are on Defendants side. Then Defendant Ashworth discusses how it is necessary to "influence" the "public officials" and "influence the Town of Fishkill" to block development.

184.    Defendant Ashworth states that his challenge is "First we have to get the owner into a position where nobody is going to allow him to develop the site.  So, that requires us to influence the Town of Fishkill to convince them this is really, truly a unique Revolutionary War site.  And once all the planning is blocked, and the owner and the owner realizes 'Shit I can't do anything with this anyway, he might as well sell it to the crazies who are trying to save it and then have him bring his price down."

185.    Defendants put those words into action and tampered with and possibly corrupted the Town of Fishkill Planning Board.  From June 2015 to January 2016, when Plaintiffs' development plan was first before the Town of Fishkill Planning Board, Defendant Stephen Thomson was a voting member of the Planning Board and the most outspoken board member against of Continental Commons.

186.    Thomson has close ties with Defendants Ashworth and Farrell.  On May 16, 2013, Defendants Ashworth, Farrell, and Thomson attended a lunch meeting with Plaintiff Broccoli to discuss the acquisition of the Property by FOFSD.  Defendants Farrell and Ashworth introduced Thomson to Plaintiff only as "our Architect."

187.    Thomson then showed Plaintiffs the plan he had developed to preserve not only the property but also portions of the nearby Dutchess Mall called "Fishkill Living Historic Park."  At this meeting Plaintiffs were unaware that Thomson was a Planning Board Member.  At this meeting Thomson made it clear that he had designed this preservation plan on behalf of Defendants.

188.    Another meeting was held on June 3, 2013, to discuss the acquisition of the Property by Defendants.  E-mails were sent by Defendants Ashworth to Defendants Farrell and Thomson, as well as to Plaintiffs to confirm these meetings.  The emails confirm that Thomson, using the email

address sthomson@co4architecture.com, was participating on behalf of Defendants in discussions with Plaintiffs to acquire the Property.

189.    On April 16, 2015, at a time when Thomson was a Planning Board member, he and Fishkill Town Supervisor Robert LaColla, who agreed to amend the Town's Comprehensive Plan to require the preservation of the Property, attended a *Lives in Ruins* book signing fundraiser for Defendant FOFSD at The Wine Bar in the Village of Fishkill.

190.    Defendant Thomson, Defendant Ashworth and others participated in discussion of the preservation of the Property and discussed tactics they might employ to stop development.  These conversations were lawfully recorded by Plaintiffs' private investigator.  During the discussion others mentioned ideas such as fundraising and getting elected officials to pressure the NYSHPO. Defendant Thomson also stated that Defendant Ashworth and he had talked about the Property on prior occasions.  Thomson further mentioned that he had been involved with Defendant Ashworth and his efforts to prevent Plaintiffs from developing the Property for a period of time.

191.    A month after the FOFSD fundraiser, when the Plaintiff submitted his development plan in May 2015, Defendant Thomson's appointment as a full time Planning Board member was extended for an additional four-year term.  Defendant Thomson attended Plaintiffs' first Planning Board meeting on June 11, 2015, where the proposed project on the Property was discussed and participated.

192.    At the June 11, 2015 meeting of the Planning Board, Defendant Ashworth was using his mobile phone to type private messages to Defendant Thomson while Defendant Thomson was on the dais participating in the meeting as a Planning Board Member.  After Defendant Ashworth typed on his phone, he would look up and make eye contact with Defendant Thomson.  At which

point Defendant Thomson would look at his laptop screen and phone.  Defendant Thomson would then repeat the negative comment on the record about the project.

193.    For example, while staring at his computer Thomson stated, "There's an underlying issue here that I think the Town has to confront as well as all of us, on what that site is, and just to focus that we have a burial site here and that's the only thing that we are creating as a sacred space is unfair."  This was the first Planning Board meeting on Plaintiffs' proposal.  No information about the archaeology of the Property had been presented at the point. The comments by Thomson, as with all the "strangle" and "bleed tactics, served to turn public opinion against Plaintiffs and delay to the approval process.  As of the date of this filing, Plaintiffs still have not received final development approval.

194.    Planning Board Member Maureen Cotter, another affiliate of Defendant FOFSD, attempted to make it appear the federal government commissioned the Hunter Technical Report and gave it much credibility.  She said at the Plaintiff's very first Planning Board meeting on June 11, 2015, "Is it my understanding the National Park Service Battlefield Protection survey is now being, it's considering in their research what this site represents, and will there be, do you think some report coming out on that?"  She later stated that the Town should not decide on the project until that report is completed, which caused more than a year's delay and bled Plaintiffs of hundreds of thousands of dollars.

195.    It was clear from the first televised Town of Fishkill Planning Board meeting that Defendants' false claim that the Property is the location of the largest Revolutionary War soldier's cemetery was being taken as fact by town officials.  Planning Board member and FOFSD ally Maureen Cotter asked publicly, **"Do you think we should be considering giving a permit to build on the largest Revolutionary War Cemetery in the country?"**

196.    After the meeting, Defendants Thomson and Ashworth were seen enjoying drinks at the bar at the Maya Café Restaurant.   When departing the restaurant, Thomson engaged in conversation with Plaintiff Broccoli, his mother, sister and attorney, stating that Plaintiff was having dinner with beautiful women while he was at the bar, and started to state that he was with 'Lan" [Lance Ashworth] but caught himself and quickly exited the premise.  On no occasion did Thomson ever publicly disclose to the Board or the public his collaboration with  Defendants.

197.    At the January 2016 Planning Board meeting, Defendant Thomson claimed to be unaware of the purpose or tenor of the Hunter report.  At this meeting Defendant Thomson urged the Board to invite Hunter to appear before the Board to present its findings.  Defendant Thomson did not disclose to the Planning Board that on October 25, 2015, he and Cotter had attended the Hunter presentation, which was also a fundraising event for Defendants.  Nor did Defendant Thomson disclose that he and Cotter had remained after the archaeology presentation was concluded to attend the portion of the gathering that was a "rally" in support of Defendants.

198.    Thomson's ties to Defendants shows that Defendants were at a minimum involved in an association that gave the appearance of a potential conflict of interest.  Furthermore, by naming Defendant Thomson "our architect" and commissioning him to design a preservation plan, Defendants potentially created a financial and professional incentive for Thomson to prevent the Property from being developed.

199.    To cast doubt with the community and the Planning Board members regarding the Plaintiff's professionals and archaeological reports, on January 14, 2016, Thomson openly stated on the record, "Do we trust them?"  This comment and similar comments by Defendants and their allies resulted in the Town hiring, at Plaintiffs expense, an independent archaeologist Paleo-West to perform additional work with respect to the Property.

200.    This additional archaeological study further "strangled" and "bled" Plaintiffs because the approval process was delayed another year and Plaintiffs had to spend hundreds of thousands of dollars more than they would have otherwise.  Defendant Ashworth even took credit for the success the fraudulent scheme was enjoying at Plaintiffs expense.  At a November 4, 2018 event, he stated that the FOFSD, "Formed a relationship with a local land-use planning law firm and helped guide us along the way for the past few years…and figure out where we can push back to the extent that we can on the review process. And I think that's been very successful. Even the Town Planning Board has admitted that this particular proposal is getting long in the tooth, in terms of its approval…and it's probably, awe not probably, I'd like to claim credit for at least some of that, because we've done our job in terms of trying to really ensure that the plan, all aspects are reviewed by the town. And so, that continues, that effort continues…"

201.    These delay tactics were discussed by Ashworth at a FOFSD Board meeting as far back as January 30, 2015 when he stated, "This year as a result of in anticipated new action and posture on the part of Dom [Plaintiff Broccoli] one of the things that the Board is going to do, the leadership, is gonna work to develop a set of contingencies, which are basically gonna be blocking and delaying actions if Dom lurches forward with a plan. The contingencies will be in all areas that we were normally working. They'll be in the legal front, they'll be in the environmental front, they'll be in the PR front, anything we can do to stop him we need to have in our back pocket and be able to release those."

202.    Defendants have never publicly disclosed the association between the FOFSD, its officers and Defendant Thomson.  However, in and around February 9, 2016, Plaintiffs' attorney, Jennifer Van Tuyl sent a letter requesting that Thomson be recused from the project review by the Planning

Board due to his association with the FOFSD.  Plaintiffs never heard back from the Planning Board on the request to have Thomson recused.

203.    Two days after the letter was sent, on February 11, 2016, Defendant Thomson was removed from the Planning Board for failing to timely have himself sworn into the position.  In response to Defendant Thomson's removal from the Planning Board, Defendant Ashworth, while in Qatar on official FBI business, emailed his team on February 14, 2016, to say, "Just yesterday I learned that perhaps our greatest ally on the Town Planning Board, architect Stephen Thomson, had been removed on what the Planning Board Chair called a 'technicality.'"

204.    In response to Defendant Thomson's removal, Defendant Ashworth drafted a letter calling for the removal of Planning Board Chair Mary Hendricks.  In a not-so-subtle reminder on the email chain of his FBI status, Defendant Ashworth concluded this email with the words "Regards from Qatar."

205.    Defendants had *ex parte* communication in violation of the law with Maureen Cotter, another member of the Planning Board.  After a meeting of the Planning Board July 9, 2015, FOFSD members Byster and Penney Steyer approached Cotter in the lobby of the Fishkill Town Hall after the Plaintiff's presentation and exchanged contact information so they could communicate further.  Cotter acknowledged that she was not to be speaking with people associated with the FOFSD while Continental Commons was being considered by the Planning Board.  That FOFSD members Steyer and Cotter continued the conversation was confirmed in an email from Steyer.

206.    On October 25, 2015, Cotter attended an event organized by Defendants.  Cotter had *ex parte* contact with Defendant Ashworth after the event and was even photographed speaking to Defendant Ashworth in the hallway.  In a letter to the Fishkill Town Supervisor dated August 31,

2016, Defendant Ashworth complained that the Planning Board Chairwoman required Cotter to disclose that Cotter had attended an event put on by Defendants.  It is unclear how Defendant Ashworth would know that Cotter was directed to make the statement by Hendricks unless he or a member of his group was in communication with Cotter.

207.    Defendant Ashworth's federal employment in general and his FBI status in particular is well known because Ashworth makes sure he mentions his FBI status when he meets elected officials, donors, and others.  He uses his FBI status to obtain the benefit of the doubt and to intimidate.  When controversy erupts such as when Ashworth's plan to picket a solemn Wreaths Across America ceremony was exposed, Ashworth announced to FOFSD that his FBI duties require him to be in some foreign destination.

208.    As an FBI Special Agent, Defendant Ashworth, is a "further restricted" federal employee as it relates to the Hatch Act.  Despite this Defendant Ashworth became heavily involved in partisan elections in the Town of Fishkill to further his efforts to "strangle" and "bleed" Plaintiff. In fact, in 2019, Ashworth was likely the determining factor in a close Fishkill Town Supervisor election in November 2019 whose campaign promise was to overturn the Plaintiffs' approval.

209.    Defendants had supported Town Supervisor Robert LaColla as far back as 2009 when he was Town Board Member.  Defendants were grateful that Supervisor LaColla was the person who headed the Town's Comprehensive Plan and incorporated the preservation of the Plaintiff's Property into the Plan in 2009 that urged the sale of and/or the preservation of the Plaintiff's Property.

210.    The Comprehensive plan was voted on and approved in July 2009.  Without explanation, the Town revisited the Comprehensive Plan just two months later.  In September 2009 it was opened to the public and again voted on and approved.  This time the Town of Fishkill incorporated

the statement related to the Property into the Comprehensive Plan. The Town minutes simply state: "John Morabito, Town Planning Consultant, stated that some wording was placed for the historic depot." The "historic depot" spanned for miles in all directions around the Property.

211.    On November 7, 2014 "The Greater Preservation and Conservation Roundtable" event was hosted by the FOFSD and Town of Fishkill, Office of the Supervisor. At this event, Defendant Ashworth stated he thinks he can purchase the 10-acre Property for $300,000, a fraction of what Defendants 2012 appraisal showed the Property was worth at the time.

212.    Defendant Ashworth, who continued to support Town Supervisor LaColla in 2015 by featuring him at their events including fundraisers. However, Ashworth did not endorse him or make the Property a central issue of the campaign in 2015, as he would in 2019 after Plaintiffs' project received conditional approval by the Town Planning Board.

213.    After years of Defendants doing all they could to "strangle" and "bleed" Plaintiffs, on May 31, 2019, Plaintiffs gained State Environmental Quality Review Act approval. Defendants having no more use for LaColla, began supporting his opponent Albra in the 2019 election rematch.

214.    In a recorded May 31, 2019, conversation Defendant Ashworth regrets supporting LaColla in 2015. Ashworth stated, "I don't think the political route… And I've tried over ten years to engage with the politicians, but it really comes down to the Planning Board. And people have told us 'you failed' because you didn't put the right people on the Planning Board. Well in Fishkill the Supervisor puts the people on the planning board. Maybe we failed in allowing the Supervisor to stay but the Supervisor otherwise has been a very good Supervisor in terms of helping us financially get on our feet."

215.    In that statement Defendant Ashworth strongly implies with the word "allowed" that he and his group could have engineered the defeat of LaColla in 2015 but didn't because LaColla had been good to the group financially.

216.    Once Defendant Ashworth began supporting Albra, the candidate made Ashworth's goal of stopping development of the Property the centerpiece of the election.  Albra's website and social media featured his opposition to development of the Property.  Campaign yard signs for Albra's Democrat ticket featured slogans explicitly opposing development of the Property along with the candidate's name.

217.    On October 20, 2019, Defendant FOFSD violated its 501c3 status and Defendant Ashworth flagrantly violated the Hatch Act when they released and circulated through email, social media and other means an "Official Statement" regarding the Town Supervisor election.  The statement brazenly stated, "LaColla refused a request by the FOFSD to have the Town Planning Board Chairperson removed from the Continental Commons review."  The statement went on to endorse Albra stating, "In both prior and recent discussions held with FOFSD leadership, Albra brainstormed and then proposed a variety of ideas on how to preserve the site, including but not limited to solutions involving both public and private funding.  Albra's stated position is one of preserving the Fishkill Supply Depot site and putting a stop to the Continental Commons development proposal."

218.    This statement by Defendant FOFSD in support of Albra is noteworthy not only because it endorses him but also because it makes clear that Albra met with the group on multiple occasions going as far back as 2009.

219.    Two weeks after Ashworth and his group endorsed Albra he won the election by 113 votes over LaColla.  When asked on election night by a reporter from the Southern Dutchess News what

his goals were, Albra said stopping development of the Property was a top priority.  In December, prior to becoming Supervisor, Albra brought a successful lawsuit as a private citizen which stopped the lame duck Town Board from voting on crucial water and sewer hook ups to the property as needed for final approval.  Nine months after Albra took office, he and his allies on the Board delayed and voted down the water and sewer hookup even though there is currently water and sewer serving the Plaintiffs' gas station and car wash on the adjacent parcel and the Town and Village of Fishkill have the capacity to provide water and sewer.

220.    Even though Defendants have successfully lobbied against connecting the Property to the town water and sewer system, in a series of emails on April 19, 2016, between Defendant Ashworth and FOFSD member Steyer, they admit that they would want the property connected to the municipal water in sewer supply if they owned the Property.  Defendant Ashworth writes, "While we at FOFSD oppose Continental Commons overall, we don't really oppose the water and arrangement that is being sought, mainly because we would likely seek the same water arrangement if we acquire the property…."

### *Assault on Plaintiffs' Livelihood and Reputation.*

221.    Plaintiff Broccoli is an Italian American born in the Bronx New York, graduate of the Culinary Institute of America and a career restaurateur.  He and his family owned Italian restaurants (Gino's Cafe) in the Fishkill area and the Bronx from 1957 to 2006.  After closing Gino's Cafe, Plaintiff Broccoli became an IHOP franchisee.  Plaintiffs' development proposal includes opening an IHOP in a replica stable structure as part of the Continental Commons.

222.    To attack Plaintiffs' livelihood, Defendants organized a "STOP IHOP" campaign in 2016 and 2017.  Defendants organized a picket of an IHOP in nearby Poughkeepsie, New York. Even though the Poughkeepsie IHOP is owned by a local franchisee unrelated to Plaintiff Broccoli.

223.    According to Defendant Ashworth, the "STOP IHOP campaign was designed as a publicity stunt to "put pressure on the organization."   The plan involved leveraging college students to boycott a local IHOP thus grabbing media coverage in hopes that the corporation would act against Plaintiffs, causing Plaintiffs financial harm and their relationship with IHOP.

224.    Defendants also instructed FOFSD members to use the internet, false email accounts, websites, and Facebook pages to conceal Defendants' and Defendant Ashworth's involvement. Ashworth directed one member to identify a "patsy" to take the fall if there were any legal repercussions with his Stop IHOP campaign.

225.    On July 28, 2015, Defendant Ashworth signed a letter from the FOFSD to the Chief Executive Officer of IHOP. The letter included the false and misleading archaeological and historical information mentioned throughout this Complaint.   Defendant Ashworth's letter also criticized Plaintiffs' project and claimed, "To be clear, it is the same parcel your franchisee intends to destroy."

226.    On December 20, 2016, Defendant FOFSD launched an online petition through Change.org.   The petition headline exclaimed, "Don't turn a famous Revolutionary War site into an IHOP restaurant."   The petition states that "A large number of Revolutionary War soldiers may still be buried on site -- according to a ground-penetrating radar survey -- which would make it one of (if not) the largest Revolutionary War cemetery in the U.S."   The final line of the petition solicits online donations to defendant FOFSD.

227.    The petition was explicitly aimed at influencing "Decision makers," specifically the "Town of Fishkill Supervisor, "Town of Fishkill Trustees" "Town of Fishkill Planning Board Members." It has more than 68,000 signatures.

228.    The "Stop IHOP" campaign picked up again in 2019, just prior to the final SEQRA public hearing for Plaintiffs' development.   The headline in a February 12, 2019, article in InsideHook.com read, "Pancakes vs Patriots: The War Over Remembering the Revolutionary War. Is an IHOP about to open atop the nation's largest Revolutionary War burial ground?"

229.    Defendant Ashworth is quoted extensively in the article.   "The Friends website says the land for Broccoli's proposed mall 'contains the soldiers burial ground, possibly the largest continental army burial ground in existence where over 300 soldiers lie in unmarked graves.' There are studies suggesting that the estimate is high, though Ashworth insists there has never been a survey exhaustive enough to provide a definitive answer.   And whatever the precise number of fallen patriots, Ashworth argues that the project is inherently disrespectful, as its 'parking areas, buildings, etc.' ensure that commercial construction "effectively suffocates the [burial] site."

230.    The article concludes with, "Meanwhile, Ashworth points out that this is not just any property, but one inextricably tied to the bodies of fallen soldiers: 'All burial grounds are sacred and whether it only contains 13 soldiers or contains 300+, it does not deserve to be suffocated and dishonored by the shadow of a chain restaurant and strip mall.'  'How solemn of a burial ground will it be,' Ashworth asks, 'with an IHOP restaurant just steps away?'"

231.    Defendants supported their Stop IHOP campaign by making false statements to various media outlets, which published stories with misleading or blatantly false headlines atop equally inaccurate stories about an IHOP being built on a Revolutionary war soldiers burial ground.

232.    For example, on August 28, 2016, a New York Post headline exclaimed, "Developer wants to sell pancakes on historic burial ground."   It also included the pithy opening line, "Pancakes? Over their dead bodies!"

233.    On April 28, 2016, The Real Deal, a New York real estate industry trade publication published a story with the headline, "Locals criticize plan to bring IHOP to Revolutionary War burial ground."

234.    Meanwhile on August 25, 2016, Inside Hook published a story with the headline, "Is the Largest Revolutionary War Burial Ground Being Replaced by an IHOP?" The article includes the rhetorical question, "Is America's largest Revolutionary War graveyard about to be transformed into an International House of Pancakes? Concerned citizens fear it is."  The family of Defendant Ashworth's FBI colleague Special Agent Brian Sherry owns this publication.

235.    The damage caused by Defendants was not limited to Plaintiffs.  Other IHOP franchisees, who were impacted by the negative publicity generated by Defendants called Plaintiff Broccoli to express their concerns.  Plaintiff had to host meetings with other franchisees to explain the nature of Continental Commons and the fact that the Property did not contain Revolutionary soldier burials.  Plaintiff Broccoli spent significant time and money meeting with these other IHOP franchisees to mitigate the damage Defendants had caused Plaintiff Broccoli and the other IHOP franchisees.

### *Intimidation of Witnesses*

236.    Defendants have intimated witnesses to Defendants' fraudulent "strangle" and "bleed" scheme.

237.    In and around November 2014, Plaintiffs retained a private investigator, Ian Bondy, to help uncover Defendants' conduct.  Mr. Bondy successfully attended FOFSD meetings and recorded statements confirming Defendants' altering of the Property and confirming that they knew that the Property did not contain a Revolutionary cemetery.

238.    On November 18, 2017, Plaintiffs GLD3 and Snook-9 realty filed a complaint in New York State Supreme Court seeking to compel Byster to identify the location of bones he and Defendant Sandy allegedly buried on the north side of the Property.  As a result of the lawsuit, the identity of Mr. Bondy and his having worked for Plaintiffs as a private investigator was revealed.

239.    On November 24, 2017, Defendant Ashworth, published derogatory information about Bondy on an "anonymous" Facebook page named "Old Albany Post History" which is administered by Defendants.

240.    On November 25, 2017, Defendants published a "Call to Arms" from an anonymous Facebook page named "The Dutchess Militia – Call to Arms, which is administered by Defendant Ashworth. The "call to arms" included a pictures of Mr. Bondy and his car.

241.    Defendants published the "Call to Arms" to intimidate Mr. Bondy and any other witnesses with information regarding Defendants' scheme, including their manipulation and seeking of the Property, from serving as a witness for Plaintiffs.

## CAUSES OF ACTION

### COUNT ONE
### (against the RICO Defendants)

### Racketeering in Violation of the Influenced and
### Corrupt Organizations Act, 18 U.S.C. § 1962(c)

242.    Plaintiffs incorporate by reference all paragraphs in the Complaint and re-allege them as if set forth fully herein.

243.    Plaintiffs are natural persons, and as such are "persons" within the meaning of 18 U.S.C. § 1961(3).

244.    The RICO Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the Friends of the Fishkill Supply Depot through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

245.    At all times relevant to this Complaint, the Friends of the Fishkill Supply Depot was an association-in-fact within the meaning of 18 U.S.C. § 1961(4), comprised of a network of individuals and associates that shared a common purpose, including but not limited to:

   (i)     Lance Ashworth;
   (ii)    William Sandy;
   (iii)   Mara Farrell;
   (iv)    Douglas Mackey; and
   (v)     Stephen Thomson

246.    At all times relevant to this Complaint, the FOFSD Enterprise was a legal entity and an enterprise within the meaning of 18 U.S.C. § 1961(4) operated, directed, and controlled by the Individual Defendants.

247.    The FOFSD Enterprise had the common purpose of earning revenue from individual donors, not-for-profits, corporations and local, state and federal government agencies by conveying a false and misleading message on behalf of the Defendants, namely that:

   **a.**  The Property holds the "Largest Revolutionary War Cemetery in the Country";

   **b.**  The proposed development of the Property will "destroy nearly all that remains of a unique historic site;

   **c.**  An IHOP restaurant is going to be built on a Revolutionary War burial site;

   **d.**  A Revolutionary War soldiers' burial ground is at immediate risk of being permanently lost to commercial development;

   **e.**  Specific known individual Revolutionary War soldiers are known to be buried on the Property;

   **f.**  The Property has never been studied in earnest;

    **g.** The Property is the entirety of the Fishkill Supply Depot and the "core" of the military supply operations at Fishkill; and

    **h.** The proceeds of their fundraising efforts are going to go to purchase the Property;

    **i.** The standing 19th-Century ruin on the Property is connected to the Fishkill Supply Depot.

248. Defendant Ashworth exercised substantial control over the Association-in-Fact entities through his position as the President of FOFSD and by ensuring that his status as an active Federal Bureau of Investigation Special Agent was well-known throughout the community, especially when speaking as President of the FOFSD.

249. At all relevant times, the FOFSD, by virtue of its status as a legal not-for-profit corporation, is separate and distinct from the RICO Defendants, who operated, directed, and controlled the FOFSD.

250. In carrying out the Fraudulent Scheme, the RICO Defendants used the FOFSD Enterprise to engage in interstate commerce and/or cause the FOFSD's activities to affect interstate commerce. FOFSD has donors, members and officers in different states and representatives of FOFSD who made appearances in several states in conducting the Enterprise and carrying out the Fraudulent Scheme.

251. Under the direction of the RICO Defendants, the FOFSD Enterprise had an ongoing organizational framework for carrying out its objectives and functioned as a continuing unit with a common purpose. Each RICO Defendant in the FOFSD Enterprise had a systematic linkage to each other RICO Defendant through contractual relationships, financial ties, and the continuing coordination of their activities.

252. By engaging in the Fraudulent Scheme, the RICO Defendants conducted the affairs of the FOFSD through a pattern of racketeering activity. The racketeering activity was made possible

by the regular and repeated use of the facilities, services, legal entities, and officers of the FOFSD Enterprise.

253.    The RICO Defendants carried out the Fraudulent Scheme through numerous acts of mail and wire fraud, which acts are indictable under 18 U.S.C. §§ 1341 and 1343, respectively, and thus constitute racketeering activity within the meaning of 18 U.S.C. § 1961(1).

254.    The RICO Defendants used thousands of interstate mail and wire communications to create and perpetuate the Fraudulent Scheme, through communications between and among the RICO Defendants and members of the FOFSD Enterprise, money transfers, false statements, misrepresentations, and misleading omissions alleged in this Complaint.  These acts of mail and wire fraud together constitute a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

255.    The RICO Defendants engaged in a pattern of racketeering that continues today. Throughout the duration of the fraudulent scheme to injure Plaintiffs, the RICO Defendants, knowing these statements were false, described the FOFSD's purpose as one to "Preserve and commemorate significant historic and archaeological structures and sites," "Work with representatives of New York State, the Federal government and interested parties to purchase or otherwise preserve portions of the historic Fishkill Supply Depot lands that remain undeveloped and explore how these lands can best be used to commemorate the activities that occurred on these hallowed grounds, especially those lands where gravesites of former soldiers have been identified."  The FOFSD Defendants made these knowingly false statements to raise money to fund the fraudulent scheme as a way to injure Plaintiffs, to devalue Plaintiffs' Property, and to further their attempts to acquire the Property.

256.     The pattern of racketeering continued until at least through January 24, 2021, when the last known donation was received by FOFSD via GoFundMe.com.

257.     By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiffs for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT TWO**
**(against the RICO Defendants)**

**Conspiracy to Conduct the Affairs of a**
**Racketeering Enterprise, 18 U.S.C. § 1962(d)**

258.     Plaintiffs incorporate by reference all paragraphs in the Complaint and re-allege them as if set forth fully herein.

259.     The RICO Defendants have agreed and conspired to violate 18 U.S.C. § 1962(c), as set forth above, in violation of 18 U.S.C. § 1962(d).   The RICO Defendants have intentionally conspired and agreed to directly, and indirectly, conduct and participate in the conduct of the affairs of the FOFSD Enterprise through a pattern of racketeering activity.   The Rico Defendants knew that their predicate acts of mail and wire fraud were part of a pattern of racketeering activity and agreed to the commission of those acts to further their scheme to injure Plaintiffs and block Plaintiffs' development project.

260.     As a direct result and proximate result of Defendants' conspiracy, and the multiple overt acts taken by the RICO Defendants in furtherance of that conspiracy, Defendants have caused significant injury to Plaintiffs.

## COUNT THREE
## (against All Defendants)

### Prima Facie Tort

261.    Plaintiffs incorporate by reference all paragraphs in the Complaint and re-allege them as if set forth fully herein.

262.    Defendants knowingly and intentionally committed the above pled overt acts with purpose of causing harm to Plaintiffs.

263.    Defendants knowingly and intentionally committed the overt act to cause harm to Plaintiffs' reputation and to delay and or block Plaintiffs' development of the Property.

264.    As a result of Defendants' intentional actions, Plaintiffs have suffered injuries to their reputation, the Property and the Plaintiffs' business ventures.

265.    Plaintiffs have suffered cognizable and calculable damages in an amount be proven at trial not less than $6,000,000.

## COUNT FOUR
## (against All Defendants)

### Tortious Interference with Business Relations

266.    Plaintiffs incorporate by reference all paragraphs in the Complaint and re-allege them as if set forth fully herein.

267.    Defendants were aware of Plaintiffs' plans to develop the Property into a commercial development.

268.    Defendants knew that Plaintiff Broccoli was and is an IHOP franchisee.

269.    Defendants knew that Plaintiffs planned to open an IHOP restaurant on the Property as part of the Continental Commons project.

270.    Defendants knew that Plaintiffs wanted to open a hotel on the Property as part of the Continental Commons project.

271.    Defendants committed the overt acts alleged in the Complaint with the intent to disrupt, interfere with, and damage Plaintiffs' relationships with IHOP and other national restaurant and hotel businesses so as to injure Plaintiffs and block the development of Continental Commons.

272.    Defendants did in fact interfere with the business relationships of Plaintiffs.

273.    Defendants acted with actual malice in committing the over acts alleged in the Complaint. Defendants' actions constituted illegal, dishonest, unfair and improper means in furtherance of their fraudulent scheme to strangle and bleed Plaintiffs.

274.    Defendants committed the over acts to cause injury to Plaintiffs.

275.    Defendants actions injured Plaintiffs' relationships with IHOP and other national restaurant and hotel chains due to Defendants' overt acts.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

A.    A judgment declaring that Defendants have committed the violations of law alleged in this case;

B.    Award actual, compensatory, statutory, consequential damages in an amount not less than $6,000,000.

C.    Award punitive and treble damages;

D.    Award equitable monetary relief, including restitution and disgorgement of all ill-gotten gains, and the imposition of a constructive trust upon, or otherwise restricting the proceeds of Defendants' ill-gotten gains, to ensure an effective remedy;

E.      Refund donors and government agencies who were deceived by their fraudulent acts.

F.      Award Plaintiffs the costs of this action, including reasonable attorneys' fees and expenses and expert fees;

G.      Enjoin Defendants from continuing to falsely market and advertise, conceal material information from the public, and commit unlawful and unfair business acts and practices; and order Defendants to engage in a corrective notice campaign;

H.      Award declaratory relief;

I.      Award pre-judgment and post-judgment interest at the highest rate allowed by law; and Plaintiffs  such further relief as this Court may deem just and proper.


**<u>JURY DEMAND</u>**

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.



Dated:  August 17, 2021
          New York, New York


**HOLLAND & KNIGHT LLP**


By:   _____
          Stephen J. Riccardulli (SR 7784)
          Chiara D. Kalogjera-Sackellares (CK 0725)
          31 West 52nd Street
          New York, NY 10019
          Tel.  212.513.3541
          Fax  212.440.4401
          stephen.riccardulli@hklaw.com

          *Attorneys for Plaintiffs*


61