UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DOMENICO BROCCOLI, GLD3 LLC,
*and* SNOOK-9 REALTY INC.,

                              Plaintiffs,

          v.

LANCE ASHWORTH, MARA FARRELL,
GREENHOUSE CONSULTANTS INC.,
DOUGLAS MACKEY, WILLIAM SANDY,
STEPHEN THOMSON, *and* DOES 1-25,

                              Defendants.

No. 21-CV-6931 (KMK)

OPINION & ORDER

---

<u>Appearances:</u>

Chiara Kalogjera-Sackellares, Esq.
Stephen J. Riccardulli, Esq.
Holland & Knight LLP
New York, NY
*Counsel for Plaintiffs*

Patrick F. Palladino, Esq.
Milber, Makris, Plousadis & Seiden, LLP
Woodbury, NY
*Counsel for Defendants Lance Ashworth, Mara Farrell, & William Sandy*

Peter T. Shapiro, Esq.
Lewis Brisbois Bisgaard & Smith LLP
New York, NY
*Counsel for Defendant Greenhouse Consultants Inc.*

Charles F. Sanders, Esq.
NYS Office of the Attorney General
New York, NY
*Counsel for Defendant Douglas Mackey*

Nicholas A. Pascale, Esq.
Drake, Loeb, Heller, Kennedy, Gogerty, Gaba & Rodd PLLC
New Windsor, NY
*Counsel for Defendant Stephen Thomson*

KENNETH M. KARAS, United States District Judge:

Plaintiffs Domenico Broccoli ("Broccoli"), GLD3, LLC ("GLD3"), and Snook-9 Realty, Inc. ("Snook-9", collectively "Plaintiffs") filed the instant Action against Lance Ashworth ("Ashworth"), Mara Farrell ("Farrell"), Greenhouse Consultants Incorporated ("Greenhouse"), Douglas Mackey ("Mackey"), William Sandy ("Sandy"), Stephen Thomson ("Thomson"), and Does 1-25 (collectively, "Defendants"), alleging one count of the Racketeer Influence and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), one count of a RICO conspiracy, 18 U.S.C. § 1962(d), as well as a state law claim for tortious interference with business relations. (*See* Sec. Am. Compl. ("SAC") (Dkt. No. 49).)

Before the Court are three Motions to Dismiss the Second Amended Complaint (the "SAC") pursuant to Federal Rules of Civil Procedure 12(b)(6): one on behalf of Thomson, (*see* Not. of Mot. ("Thomson Not. of Mot.") (Dkt. No. 56)), one on behalf of Ashworth, Farrell, and Sandy (collectively "Ashworth Defendants"), (*see* Not. of Mot. ("Ashworth Not. of Mot.") (Dkt. No. 57)), and one on behalf of Greenhouse (*see* Not. of Mot. ("Greenhouse Not. of Mot.") (Dkt. No. 65)). In addition, Mackey has filed another Motion to Dismiss the Second Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b), (*see* Not. of Mot. ("Mackey Not. of Mot.") (Dkt. No. 58)). For the foregoing reasons, all Motions are granted.

## I.  Background

### A.  Materials Considered

As a threshold matter, the Court determines the proper treatment of an exhibit attached to Defendant Mackey's Motion to Dismiss. Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves," because "[t]o go beyond the allegations in the [c]omplaint would convert the Rule 12(b)(6) motion to dismiss into one for

summary judgment pursuant to [Rule] 56." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (citation omitted).  However, "the Court's consideration of documents attached to, or incorporated by reference in the [c]omplaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment."  *Id.* (citations omitted); *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling on a Rule 12(b)(6) motion to dismiss," courts may "consider the complaint in its entirety . . . , documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" (quotation marks omitted)); *Hu v. City of N.Y.*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken." (alteration omitted) (quoting *Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993))).

"Moreover, 'where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint.'"  *Alvarez v. Cnty. of Orange*, 95 F. Supp. 3d 385, 394 (S.D.N.Y. 2015) (alteration omitted) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)).  As the Second Circuit has reiterated, "a plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (emphasis omitted).

The final test for the consideration of extrinsic evidence is the Parties' view on the authenticity thereof.  Put simply, "even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document"

for it to be considered at the motion to dismiss stage. *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

Here, Defendant Mackey attaches two documents for the Court to take notice of in deciding the instant Motion. First, Mackey attaches an affidavit filed by Mackey in a New York Supreme Court case featuring the same parties to this litigation. (*See* Aff. of Chas. F. Sanders in Supp. of Mot. to Dismiss Ex. 1 ("Mackey Aff") (Dkt. No. 64-1).) Second, Mackey attaches a February 2007 letter allegedly from Mackey to Barry Greenhouse, Principal at Greenhouse, discussing the potential redevelopment project. (*See* Mackey Not. of Mot. Ex. 2 ("Parks Letter") (Dkt. No. 58-2).)

As to the Mackey Affidavit, the Court will consider the document as it is incorporated into Plaintiff's complaint. On January 13, 2020, Mackey submitted an affidavit in a related case before the Dutchess County Supreme Court. (*See* Mackey Aff.) *See also Friends of Fishkill Supply Depot., v. GLD3, LLC*, Index No. 2019-51889, Doc. No. 102 (N.Y. Sup. Ct. Jan. 13, 2020). Despite referring to the wrong date of filing for the Affidavit, (*see* SAC ¶ 77 (dating the affidavit as on "January 13, 2021")), it is clear to this Court that this affidavit is the basis of at least one allegation against Mackey. (*See id*. (stating that Mackey "knowingly accepted the false information contained in the Greenhouse 2009 Report," and pointing to the affidavit where Mackey "admitted . . . that there was activity on the Property after the Revolution"); Pls.' Mem. of Law in Opp'n to Mot. to Dismiss ("Pls.' Mackey Opp.") 4 (Dkt. No. 70) (alleging that Mackey "contradicted his earlier positions" in the affidavit where "he acknowledged there was other development activity on the property after the Revolution").) As this affidavit filed in New York State Court is "incorporated into the complaint by reference," the Court will consider the

affidavit in deciding the instant Motion to Dismiss as it pertains to Mackey. *Bellin*, 6 F.4th at 473; *Hu*, 927 F.3d at 88.

However, the Court declines to take judicial notice of the letter attached as Exhibit 2 by Mackey. First, the Amended Complaint makes no reference to this letter in relation to the allegations directed at Mackey. (*See generally* SAC.) Instead, several allegations discuss a letter allegedly sent by Mackey *after* the filing of a 2009 report, which would postdate the letter attached by Mackey. (*See id.* ¶¶ 63–67.) Moreover, no Party has argued—nor has the Court found any reason to believe—that "the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *Alvarez*, 95 F. Supp. 3d at 394. As such, and in an effort to avoid "convert[ing] the motion to dismiss into one for summary judgment[,]" the Court declines to take judicial notice for the purposes of the instant Motion to Dismiss. *Thomas*, 232 F. Supp. 2d at 275.

### B. Factual Background

The following facts are drawn from the FAC and are assumed to be true for the purposes of resolving the instant Motion. *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam).

#### 1. The Parties

This Action involves numerous parties with various roles in the unlawful scheme alleged by Plaintiffs. For clarity, the Court provides a summary of the Parties and their respective roles in the alleged scheme.

Plaintiff Broccoli is a graduate of the Culinary Institute of America and a "lifelong restauranteur" who currently owns and operates four IHOP franchises, among other ventures. (SAC ¶ 10.) As relevant to the instant Action, Broccoli is a principal at corporate Plaintiffs

GLD3 and Snook-9, who together own the property at issue in this litigation. (*Id*. ¶¶ 10–12.) GLD3 is a New York limited liability company that owns a parcel of real property slated to be developed as Continental Commons ("the Property" or "Continental Commons"). (*Id*. ¶ 11.) Snook-9 is a New York corporation that also owns a parcel of property that will be developed alongside GLD3's property to create the larger Continental Commons. (*Id*. ¶ 12.) Broccoli has been a principal at GLD3 and Snook-9 throughout the ownership of the Property since 1986. (*Id*. ¶ 10.)

Plaintiffs categorize Defendants Ashworth, Sandy, Farrell, and Does 1–10 as the "RICO Defendants" throughout the Amended Complaint. (*Id*. ¶ 16.) Ashworth is the President of Friends of the Fishkill Supply Depot ("FOFSD"), which was created for, among other things, the "permanent protection of the Continental Army Burial Complex within the boundaries of the Fishkill Supply Depot." (*Id*. ¶¶ 3, 13.) Ashworth, in addition to being a Special Agent with the Federal Bureau of Investigation ("FBI") in Dutchess County, "leads FOFSD's fundraising operations and makes all strategic decisions for the organization." (*Id*. ¶ 13.) Sandy is both a "registered professional archaeologist" and the "resident archaeologist" for FOFSD, and a member of FOFSD's Board. (*Id*. ¶ 14.) Farrell is a co-founder of FOFSD who also works as a public relations executive. (*Id*. ¶ 15.) Along with Does 1–10, Ashworth, Sandy, and Farrell are alleged to be "officers and members for the FOFSD." (*Id*. ¶ 16.)[1]

The Amended Complaint also lists three additional defendants: Mackey, Thomson, and Greenhouse. (*See id*. ¶¶ 17–19.) Mackey is a former Historic Preservation Analyst for the New York State Historic Preservation Office ("NYSHPO"). (*Id*. ¶ 17.) Thomson is a former member

---

[1] The Court does not address Does 11–25 as alleged in the instant Amended Complaint, as they are not referenced as in the present litigation outside of the case caption.

of the FOFSD, in addition to his role as a member of the Town of Fishkill Planning Board.  (*Id*. ¶ 18.)  Finally, Greenhouse is a historical research and archaeology consulting firm based in Atlanta, Georgia with an office in New York.  (*Id*. ¶ 19.)

### 2.  The Property

Plaintiffs own a 10.4-acre parcel of land in Fishkill, New York, located on a commercially developed area of the local Route 9.  (*Id*. ¶ 24.)  "Like much of the land in Fishkill and neighboring towns, the Property falls within . . . the 'Fishkill Supply Depot'" which is an area near the Town of Fishkill first coined by archaeologists in the 1970s.  (*Id*. ¶¶ 30, 32.)  At times, the Fishkill Supply Depot "has been used to refer to the overall historic depot used during the Revolutionary War," which consisted of a "wide range of diverse and distinct facilities that were not located on contiguous properties" in portions of Village of Fishkill, East Fishkill, Snow Valley, and Fishkill Landing (now referred to as the City of Beacon).  (*Id*. ¶ 32.)  "The Property also falls within the 74-acre National Register of Historic Places tract[,]" and the "Fishkill Supply Depot" term has also been used to refer to the National Register property known as the "Fishkill Supply Depot National Register Site[,]" which itself is a "small portion of the greater Fishkill Supply Depot."  (*Id*. ¶¶ 31, 33–34.)  Of note, most of the Village of Fishkill land (which encompasses both the National Register of Historic Places and Fishkill Supply Depot) has been "extensively developed . . . including a recently built Home Depot, a McDonalds, hotels, [and] two banks," properties belonging to Plaintiffs, and other commercial enterprises.  (*Id*. ¶ 31.)

The Property at issue in the instant litigation was purchased around 1986 by Touchdown Development Corporation ("Touchdown"), which is a "predecessor company" to GLD3 and Snook-9.  (*Id*. ¶ 25.)  In and around the 1990s, "Touchdown built a gas station and convenience store on one and a quarter acre[s] of land on the northwest portion of the Property."  (*Id*.)  As

required, Touchdown received approvals from the Town of Fishkill and the NYSHPO in about two years prior to developing this land.  (*Id*.)  In and around 2000, "Plaintiffs sought approval to build a hotel on the northeast portion of the Property[,]" which also went under review by NYSPHO under the supervision of Mackey.  (*Id*. ¶ 26.)  The review was completed and approved in less than a year, however Plaintiffs decided not to move forward with the hotel development at that time.  (*Id*.)

"In or around 2006, Plaintiffs began to develop their plan for Continental Commons on the remaining 10 plus acres of land, which will operate as a commercial, social[,] and educational center with a restaurant, shops, and an inn."  (*Id*. ¶ 27.)  Plaintiffs also plan to "incorporate features that will allow visitors to enjoy an interactive and immersive historical experience" by integrating "plaques and architectural elements from historically significant buildings in Dutchess County[.]"  (*Id*. ¶ 28.)  Continental Commons will also include a "Dutchess County Visitor's Center" to teach visitors about "the rich history of the Town of Fishkill and its relationship to the American Revolution."  (*Id*. ¶ 29.)

While developing the Continental Commons proposal, Plaintiffs were "required to conduct archaeological research on the Property[.]"  (*Id*. ¶ 36.)  Around October and November 2007, NYSHPO and Mackey supervised an investigation which "identified 7 suspected grave shafts located in the southwest corner of the Property[,]" as well as one confirmed human burial. (*Id*. ¶ 37.)  In 2013, additional testing was taken under Mackey's supervision, "delineat[ing] the northern and eastern most boundaries of the burial area."  (*Id*.)  "In all, the burial area comprises 0.4 acres in the southwest corner of the Property."  (*Id*.)  Plaintiffs were also required to conduct an additional archaeological investigation in the northern portion of the Property where Plaintiffs plan to develop.  (*Id*. ¶ 39.)  A 2012 report found that "[n]o graves or significant archaeological

8

features were identified." (*Id*.)  Plaintiffs' development plan "designates and memorializes the burial area in the southwest corner of the Property as a burial ground" so that Plaintiffs cannot build in that area.  (*Id*. ¶ 40.)  Plaintiffs instead plan to provide public access to the area, install signage, and provide education information to visitors.  (*Id*.)

### 3.  Defendants' Alleged Fraudulent Scheme

Plaintiffs allege that Defendants, both individually and collectively, participated in a fraudulent scheme to "devalu[e] Plaintiffs' Property and destroy[] Plaintiffs' business interests." (*Id*. ¶¶ 2, 4.)  Specifically, Plaintiffs allege that "Defendants are officers, members[,] and supporters of a not-for-profit 501(c)(3) organization known as [FOFSD], whose stated purpose is the 'permanent protection of the Continental Army Burial Complex within the boundaries of the Fishkill Supply Depot, stringent archaeological review of development projects that may affect the site, preservation of archaeological resources associated with the Fishkill Supply Depot during the Revolutionary Period, and the future interpretation of the historic site for public benefit.'"  (*Id*. ¶ 3.)  However, Plaintiffs allege that "[t]hrough the FOFSD, Defendants have made intentionally and knowingly false statements to the public, financial donors, politicians, governmental bodies, courts[,] and the media to intentionally confuse Plaintiffs' property" with the Fishkill Supply Depot "to block the development of Continental Commons[,] devalue Plaintiffs' property[,] and to cause injury to Plaintiffs."  (*Id*. ¶ 4.)

As relevant to the instant Action, Plaintiffs allege specific acts as to each Defendant, as outlined below.

### a.  Defendant Greenhouse

Plaintiffs allege that Greenhouse "prepared a knowingly false report that intentionally mischaracterized the historical and archaeological record to create the appearance that Plaintiffs'

property was related to the Fishkill Supply Depot." (*Id*. ¶ 19.)  Specifically, Plaintiffs retained Greenhouse several times throughout the 1990s, with Greenhouse performing investigations on the northeast portion of the Property in 1998, 1999, and 2000 in connection with Plaintiffs' previous hotel project.  (*Id*. ¶ 54.)  At the end of these investigations, Greenhouse concluded that "no evidence of Revolutionary War activities was found . . . [and] no evidence of any burials dating to the Revolutionary War or any other time period was seen[.]"  (*Id*. (first and second alterations in original).)

Plaintiffs again retained Greenhouse in 2007 to perform the additional investigation required by NYSHPO in relation to the proposed Continental Commons development.  (*Id*. ¶ 55.)  During this investigation, Greenhouse identified "grave features" for a "human burial" in the southwest portion of the property, but "it did not identify any artifacts that could be used to date the burial" and Greenhouse "took no other steps to attempt to date or identify the remains found in the burial."  (*Id*. ¶¶ 55–56.)  Greenhouse's final report was released in January 2009 (the "2009 Report"), which stated that "the burial [found in the investigation] was from the Revolutionary War" and "the stone ruins and features on the northern portion of the Property outside of the burial area were related to the Fishkill Supply Depot."  (*Id*. ¶¶ 57, 59.)  Plaintiffs allege that "Greenhouse knew these statements to be false when it prepared the 2009 report." (*Id*. ¶ 59.)  Finally, "Greenhouse submitted the 2009 Report to Defendant Mackey at NYSHPO . . . without authorization and/or consent from Plaintiffs."  (*Id*. ¶ 61.)

### b.  Defendant Sandy

Plaintiffs allege that Sandy was a "contract archaeologist hired by Greenhouse to perform the 2000 and 2007 investigations" and that he "co-authored" the 2009 Report.  (*Id*. ¶ 58.)

"Unbeknownst to Plaintiffs, [] Sandy was already affiliated with the FOFSD in 2008 at the time he was working on the Greenhouse report."  (*Id.*)

In addition, in 2008, an unknown entity conducted a "ground penetrating radar study" ("2008 GPR study") in the burial area.  (*Id.* ¶ 64.)  Plaintiffs allege that Sandy "solicited and received an interpretation of the [2008] GPR study from renowned GPR expert Dr. Bruce Bevan" who refuted Defendants' claim that "anomalies" referenced in this study "represented 320 individual soldiers' burials."  (*Id.* ¶¶ 84–85.)  "Additionally, on or around January 30, 2015, Defendant Sandy received an email from Tim Lloyd at NYSHPO, who had reviewed Dr. Bevan's analysis and agreed that the goal of the 2008 GPR study was 'to define the cemetery boundary, and not to identify every specific grave location.'"  (*Id.* ¶ 85.)

Plaintiffs also allege several facts about Sandy fabricating "anomalies" on the Property by digging holes in the shape of grave shafts with Ashworth and Farrell.  (*See id.* ¶¶ 117–38.) Among other items, Plaintiffs allege that Sandy, Ashworth, and Farrell planted Revolutionary War artifacts, "shallow bones" and human remains, and additional "grave shafts" throughout the Property to trigger additional investigations of the Property.  (*Id.*; *see also id.* ¶ 135 (stating that "Ashworth, Farrell[,] and Sandy have referenced the discovery of buttons and 'shreds of Continental Army' uniforms found in 8 graves").)  In addition to alleging that Sandy made unspecified statements about some of these discoveries, (*see e.g. id.* ¶¶ 131–32 (alleging Sandy "was speaking about a mass burial on the Property" and "referenced the 'shallow bones' discovered in the burial area")), Plaintiffs allege that Defendants used these anomalies to "confuse the archaeology" in a second GPR study conducted in 2012 by Radar Solutions International (the "2012 GPR study") which "detected sixteen anomalies that resembled the

shape and depth of the burial features discovered by [] Sandy and Greenhouse in 2007." (*Id*. ¶¶ 119–23.)

Plaintiffs allege that "Defendants continued to knowingly misrepresent the GPR study[,]" (*id*. ¶ 85), including an allegation that "[i]n September 2012, [] Sandy was videotaped misleading" the author of a "best-selling book on archology [sic]" about the 2008 and 2012 GPR studies where Sandy "can be heard telling [the author] that the 2012 GPR study detected additional graves on the north side of the Property[,]" (*id*. ¶ 170). According to Plaintiffs, the book includes a chapter on these false claims later referenced in a review by *Washington Post*, stating "contract archaeologist Bill Sandy discovered 'the largest cemetery of Revolutionary War soldiers in the country,' which seven years later still sits unexcavated, because the owners want $6 million for the land and there are no federal funds for purchasing it. Sandy gives tours and talks about the site, while a private organization tries to raise money to buy it." (*Id*. ¶¶ 171–72.)

Plaintiffs further allege that "Defendants have long claimed publicly that while on the Property, [] Sandy and Farrell discovered a Continental Army shoe buckle along the side of the burial trench" on the north side of Plaintiff's Property. (*Id*. ¶ 112.) "[A]fter soliciting an opinion from the West Point Museum regarding the nature of the buckle, [] Sandy was informed the artifact was a common man or women's shoe buckle, not that of a Revolutionary War soldier." (*Id*. ¶ 114.) Sandy then "quickly relayed the opinion" to Ashworth, however, "Defendants continued to claim that it was from a Revolutionary War soldier uniform to solicit donations. (*Id*. ¶¶ 114–15.) In 2018, Farrell returned the buckle to Plaintiffs. (*Id*. ¶ 116.)

Plaintiffs also allege Sandy's involvement in a 2016 report prepared by Hunter Research, Inc. (the "2016 Hunter Report") which "intentionally misrepresented the archaeological and historical record so as to link the Property to the Fishkill Supply Depot." (*See id*. ¶¶ 139–59.)

Specifically, Plaintiffs allege that "Sandy was the paid archaeological consultant" for the 2016 Hunter Report which was supervised by Ashworth, and that no Defendant "disclose[d] their involvement with the Hunter Report to the Town of Fishkill." (*Id*. ¶ 146.)

Finally, Plaintiffs allege that Sandy "sought to influence government records through [Defendants'] misinformation campaign" by "deceiv[ing]" a government official, stating that the graveyard on the grounds of Fishkill Supply Depot is on Plaintiffs' property. (*Id*. ¶¶ 174–76.) After receiving documentation from NYSHPO and other sources by Plaintiffs, the official amended a written study to remove that claim, stating that the official "used archaeological information provided to [them] by William Sandy," which contained "incorrect, misleading[,] and inappropriate statements[.]" (*Id*. ¶ 176.)

### c.  Defendant Mackey

Plaintiffs allege that Defendant Mackey "had strong ties to [] FOFSD and was assigned by NYSHPO to advise on the historical significance of the Property." (*Id*. ¶ 17.)  Specifically, Plaintiffs allege that "Mackey's coordination with the other [D]efendants was integral to [D]efendants' . . . scheme, causing Plaintiffs to spend millions of dollars [more] than would otherwise have been required." (*Id*.)

Plaintiffs allege that Mackey was a part of many of the allegations previously discussed as it relates to other Defendants.  For example, Plaintiffs allege that Mackey "approved and supervised" the archaeological investigation of the Property in October and November 2007, which identified seven suspected grave shafts and the human burial. (*Id*. ¶ 37.)  In that role, Plaintiffs allege that Mackey "abused his role with NYSHPO to extend [an] investigation [of the Property] so as to increase Plaintiffs' costs and to delay and/or block Continental Commons." (*Id*. ¶ 17.)  Moreover, Plaintiffs allege that "[n]otwithstanding his extensive knowledge [of

archaeology and history of the area], Mackey knowingly accepted the false information contained in the Greenhouse 2009 Report without comment regarding the mischaracterization of the Property's use and previous archaeological investigations." (*Id.* ¶ 77.)

After the filing of the 2009 report, Plaintiffs allege that Mackey, on behalf of the NYSPHO, sent a letter to an associate of Broccoli's regarding a discussion between the two, and "without justification or cause copied the Town of Fishkill Board members." (*Id.* ¶ 63.) And in that letter, "Mackey knowingly and intentionally echoed the false information stated in the 2009 Report and misrepresented the results" of the 2008 GPR study, to "support his recommendation that the entire Property be preserved and that hundreds of Revolutionary War soldiers were buried on the Property. (*Id.* ¶ 64.) According to Plaintiffs, this letter "justified an amendment to the newly adopted Town's Comprehensive Plan which called for the need to preserve the Fishkill Supply Depot." (*Id.* ¶ 65.)

Plaintiffs also allege that "Defendants, including Ashworth, Farrell, Sandy[,] and Mackey . . . used the social media profile 'Old Albany Post Road History' to further their fraudulent scheme . . . [a]s recently as November of 2021," when "Defendants published the following statement, while referring to the property: 'hundreds of graves that date back to the Revolutionary War have been found at the Fishkill Supply Depot.'" (*Id.* ¶¶ 101–02.)

### d.  Defendant Thomson

Plaintiffs allege that Thomson "abused his role on the [Town of Fishkill] Planning Board to extend the investigation of the Property[] so as to increase Plaintiffs' costs and to delay and/or block Continental Commons." (*Id.* ¶ 18.) Specifically, from June 2015 through January 2016, "when Plaintiffs' development plan [for Continental Commons] was first before the Town of

Fishkill Planning Board," Thomson was "a voting member of the Planning Board and the most outspoken board member against [] Continental Commons." (*Id*. ¶ 211.)

Plaintiffs' allegations surrounding Thomson largely consist of descriptions of Thomson's allegedly hidden association with FOFSD. (*Id*. ¶¶ 212–33.) For example, Plaintiffs allege that Thomson "has close ties with [] Ashworth and Farrell" who have introduced Thomson to Plaintiffs as "our Architect." (*Id*. ¶ 212.) Plaintiffs allege that, on or around June 3, 2013, "[e]mails were sent by [] Ashworth to [] Farrell and Thomson, as well as to Plaintiffs to confirm" meetings to discuss the acquisition of the Property by the Defendants. (*Id*. ¶ 214.) Plaintiffs allege that "[t]he emails confirm that Thomson . . . was participating on behalf of Defendants in discussions with Plaintiffs to acquire the Property." (*Id*.) In addition, Plaintiffs allege that at a 2015 Planning Board meeting, Ashworth was communicating with Thomson via phone and computer to feed Thomson "negative comment[s]" to state on the record about Continental Commons. (*Id*. ¶ 218.) Plaintiffs also allege meetings between Thomson and Ashworth, (*see id*. ¶ 222), as well as Thomson's attendance at fundraising events on behalf of FOFSD, (*see id*. ¶¶ 216–17, 223). Thomson was removed from the Planning Board on February 11, 2016 for failing to timely swear into his position on the Planning Board. (*Id*. ¶ 229.)

### e.  Defendant Farrell

As the co-founder of FOFSD, Plaintiffs attribute many areas of the alleged fraudulent scheme to Farrell. For example, Plaintiffs allege that Farrell, along with Ashworth, Sandy, and Mackey, "seek to amend the [Town of Fishkill] Comprehensive Plan to state that the Property contains Revolutionary Solider burials." (*Id*. ¶ 69.) Specifically, Plaintiffs allege that Farrell and other unnamed members of FOFSD "have been appointed to the working group responsible for the review [of the Comprehensive Plan] and [will] propose amendments" to the Plan,

"continu[ing] to spread the false information regarding the Property." (*Id*. ¶¶ 70–71.)  In

addition, Plaintiffs allege that throughout the relevant time period, Farrell "served as an advisory

board member to the FOFSD, and handled the FOFSD's public relations efforts" such as

"develop[ing] the FOFSD's public statements and strategy with respect to the Property." (*Id*. ¶

79.)

On July 13, 2009, Farrell testified before the Senate Subcommittee on National Parks.

(*Id*. ¶ 165.)  During this testimony, Plaintiffs allege that Farrell "made knowingly false

statements regarding the archaeology and history of the property" by stating:

> At the endangered National Register Fishkill Supply Depot, recent archaeological
> surveys have revealed a large Continental Army Cemetery Complex and the
> remains of additional features associated with the depot. **Hundreds of graves have
> been sited on one portion of the undeveloped acres within this historic
> district—a portion currently on the market and threatened with strip mall
> development**.
>
> [ . . . ] Historians believe that hundreds, if not thousands, of Continental Army
> soldiers who sacrificed their lives and died from war wounds, hypothermia,
> dysentery, small pox and other diseases are buried at the Depot Complex, in what
> has long been termed an "unknown" location. **Today, of course, the big news is
> that finally this location is no longer "unknown."  Through rigorous
> archaeological testing and remote sensing, the location of the Continental
> Army Cemetery Complex, which again I state could well be the largest ever
> identified in United States history, has been confirmed**.  And it is located at the
> precise site where new construction was to begin for a strip mall.    The
> archaeologists on-site the night the first graves were discovered, describe the
> experience as deeply emotional and heart- wrenching.

(*Id*. ¶¶ 165–67.)  The press release from Senator Chuck Schumer repeated certain of these

claims, stating: "Recent archaeological investigations and ground penetrating radar scans have

located hundreds of graves, dating back to the 18th century, and it is anticipated that the number

of graves on the site could be more than 1,000." (*Id*. ¶ 168.)

Finally, Plaintiffs include Farrell in the allegation that she, along with Ashworth, Sandy,

and Mackey, "used the social media profile 'Old Albany Post Road History' to further their

fraudulent scheme . . . [a]s recently as November of 2021," when "Defendants published the following statement, while referring to the property: 'hundreds of graves that date back to the Revolutionary War have been found at the Fishkill Supply Depot.'"  (*Id.* ¶¶ 101–02.)

### f.  Defendant Ashworth

Plaintiffs allege that Ashworth is the mastermind of the alleged scheme against Plaintiffs' business, which involves Ashworth leading a "multi-layered web of information laundering, historical and archaeological distortion, physical alteration of Plaintiffs' property and making knowingly false statements to federal, state[,] and local governmental entities."  (*Id.* ¶ 8.) Ashworth "has been an FOFSD board member since August 2009 and has served, and still serves as the [P]resident of FOFSD[] since January 2010."  (*Id.* ¶ 43.)  Of note, Plaintiffs allege that Ashworth sought to purchase the Property in December 2013, "attempt[ing] to obtain funding, including millions in federal grant money."  (*Id.* ¶ 50.)  After Ashworth notified Broccoli that FOFSD did not secure funding to purchase the Property, Broccoli offered "to donate the two acres and the burial area to the FOFSD."  (*Id.* ¶¶ 50–51.)  Ashworth declined the offer, stating "That's not enough, we want the entire 10 acres."  (*Id.* ¶ 51.)

In additions to various allegations discussed in relation to other Defendants in this Action, Plaintiffs allege that Ashworth has made several, knowingly false statements in relation with fundraising efforts for FOFSD.  For example, in 2019 during a fundraising event, Plaintiffs allege that Ashworth stated that "eight graves were excavated during the 2007 archaeological dig [requested by NYSPHO] and that buttons and shreds from Continental Army uniforms were discovered."  (*Id.* ¶¶ 80–81.)  In addition, Plaintiffs allege that Ashworth "misrepresented archaeological evidence when completing applications to the National Parks Service and the New York State Economic Development Council."  (*Id.* ¶ 202.)  Moreover, Plaintiffs allege that

17

Defendants, including Ashworth, "continue to use the FOFSD to fundraise on the false claim that FOFSD is raising money to purchase the Property" even though it has not been for sale since 2013 "and Plaintiffs have explicitly stated that the Property will never be sold to Defendants." (*Id*. ¶¶ 203–04.)  For example, FOFSD sent a fundraising letter to potential donors signed by Ashworth stating, among other things:

> It was six years ago this month that an out-of-towner first proposed a commercial development on the National Register of Historic Places site known as the Fishkill Supply Depot, where General George Washington established his principal base for supplying the Continental Army.[ . . . ]  [W]e—those in favor of preserving, studying, and interpreting the little-understood Fishkill Supply Depot site— continue to face an enemy intent on using scare tactics to chase us from the battlefield.  In addition to suing the Town of Fishkill over its recent denial of out-of-district water and sewer extensions, the developer has notified several of our team's officer (past and present) that a new lawsuit (against us) is forthcoming.
>
> [ . . . ]  You've stood alongside us thus far and thanks to your unwavering commitment we've held-off development; now let's finish this battle once and for all!  Help us by once again re-supplying our "war chest" so that our ongoing legal battle and defense of the truth can carry the day.  Your contribution will enable us to preserve the Fishkill Supply Depot site and honor our nation's patriots . . . past and present.

(*Id*. ¶ 204.)

Plaintiffs also allege that Ashworth knows that several of his statements made to donors, government officials, and the press are false as a part of FOFSD's broader campaign to stem development by Plaintiffs.  For example, "Defendants have told [various people] that [Revolutionary] soldiers are all together in one final resting place on the Property[,] and that donating to Defendants will help preserve that land."  (*Id*. ¶ 92.)  Ashworth stated in a December 9, 2012 article that "seven bodies [from the Property] were examined more closely to date them from the period of the American Revolution."  (*Id*. ¶ 161.)  Ashworth also "routinely claims," including in an article on April 30, 2016, that Plaintiffs' Property "has never been studied 'in earnest.'"  (*Id*. ¶ 162.)  However, Plaintiffs allege that in a recorded conversation on January 30,

2015, Ashworth and another FOFSD member "acknowledge that the Property does not contain hundreds of soldiers' graves" but "rationalize the false claim by saying that if all the Revolutionary War soldiers buried in graves in three church cemeteries throughout the Town [of] Fishkill . . . were added up with those buried on Plaintiff[s'] [P]roperty, it might make the sprawling town of Fishkill home to the most Revolutionary War soldier[s'] burials." (*Id*. ¶ 92.) In what appears to be the same recorded conversation, Ashworth allegedly states that his plan to preserve the Property must be fought on the "political front" through "influence" of public officials. (*Id*. ¶¶ 209–10.) Specifically, Ashworth allegedly stated that FOFSD "ha[s] to get the [Plaintiffs] into a position where nobody is going to allow him to develop the site[,]" requiring the group to "influence the Town of Fishkill to convince them [that the Property] is really, truly a unique Revolutionary War site." (*Id*. ¶ 210.) Ashworth allegedly also stated that his goal was to get Plaintiffs to "sell it to the crazies who are trying to save it and then have [Broccoli] bring his price down." (*Id*.) Ashworth allegedly discussed these plans at an FOFSD board meeting (also on January 30, 2015) where he stated that the Board will "work to develop a set of contingencies, which are basically [going to] be blocking and delaying actions if [Broccoli] lurches forward with a plan[,]" including contingencies on "the legal front . . . the environmental front . . . the PR front, anything we can do to stop him[.]" (*Id*. ¶ 227.)

Finally, Plaintiffs allege that Ashworth was the behind-the-scenes organizer of a "STOP IHOP" campaign in 2019 to harm Plaintiffs' other businesses. (*Id*. ¶¶ 249–71.) Ashworth allegedly described the campaign as a "publicity stunt to 'put pressure on the organization'" by asking college students to boycott a local IHOP "in the hopes that the corporation would act against Plaintiffs, causing Plaintiffs financial harm and their relationship with IHOP." (*Id*. ¶ 251.) Specifically, Ashworth allegedly "directed one member to identify a 'patsy' to take the fall

if there were any legal repercussions" with the campaign.  (*Id.* ¶ 252.)  On July 28, 2015, Ashworth signed a letter from the FOFSD to the CEO of IHOP, which contained "false and misleading archaeological and historical information mentioned throughout [this] Complaint." (*Id.* ¶ 253.)  In the letter, Ashworth emphasized that the Property at issue "is the same parcel your franchisee intends to destroy."  (*Id.* ¶ 253.)  Several local press outlets covered the campaign, which included quotes from Ashworth.  For example, Ashworth was quoted in a February 12, 2019 article which states:

> The Friends website says the land for Broccoli's proposed mall 'contains the soldiers burial ground, possibly the largest continental army burial ground in existence where over 300 soldiers lie in unmarked graves.' There are studies suggesting that the estimate is high, though Ashworth insists there has never been a survey exhaustive enough to provide a definitive answer. And whatever the precise number of fallen patriots, Ashworth argues that the project is inherently disrespectful, as its 'parking areas, buildings, etc.' ensure that commercial construction "effectively suffocates the [burial] site.
>
> [ . . . ] Meanwhile, Ashworth points out that this is not just any property, but one inextricably tied to the bodies of fallen soldiers: 'All burial grounds are sacred and whether it only contains 13 soldiers or contains 300+, it does not deserve to be suffocated and dishonored by the shadow of a chain restaurant and strip mall.' 'How solemn of a burial ground will it be,' Ashworth asks, 'with an IHOP restaurant just steps away?'"

(*Id.* ¶¶ 257–58.)  Plaintiffs allege that, as a result of Ashworth's actions, "IHOP rescinded its offer to Broccoli to open an IHOP restaurant at the Property."  (*Id.* ¶¶ 265–66.)

C.  Procedural History

Plaintiffs filed their initial Complaint on October 17, 2021.  (*See* Compl. (Dkt. No. 1).) On October 6, 2021, the Ashworth Defendants filed a pre-motion letter in anticipation of filing a motion to dismiss the original Complaint, (*see* Dkt. No. 22), but Plaintiffs filed a First Amended

Complaint on December 23, 2021, (*see* Am. Compl. (Dkt. No. 35)).[2]  On January 5, 2022, the

Ashworth Defendants filed another pre-motion letter in anticipation of filing a motion to dismiss

the First Amended Complaint.  (*See* Dkt. No. 37.)  Following Plaintiffs' response to the

Ashworth Defendants' letter, (*see* Dkt. No. 42), the Court held a pre-motion conference on

February 3, 2022, (*see* Dkt. (minute entry for Feb. 3, 2022)).  Pursuant to a motion scheduling

order from this Court, (*see* Dkt. No. 48), Plaintiffs filed a Second Amended Complaint on

February 10, 2022, (*see* SAC).

On March 16, 2022, Defendant Thomson filed his instant Motion to Dismiss.  (*See*

Thomson Not. of Mot.; Def.'s Mem. of Law in Supp. of Mot. to Dismiss ("Thomson Mem.")

(Dkt. No. 56-3); Decl. of Nicholas A Pascale Esq. (Dkt. No. 56-1).)  Plaintiffs filed their

Opposition on April 15, 2022, (*see* Pls.' Mem. of Law in Opp'n to Mot. to Dismiss ("Pls.'

Thomson Opp.") (Dkt. No. 69)), and Thomson filed his reply on May 6, 2022, (*see* Def.'s Reply

Mem. of Law in Supp. of Mot. to Dismiss ("Thomson Reply Mem.") (Dkt. No. 72)).

On March 16, 2022, the Ashworth Defendants also filed their instant Motion to Dismiss.

(*See* Ashworth Not. of Mot., Def.'s Mem. of Law in Supp. of Mot. to Dismiss ("Ashworth

Mem.") (Dkt. No. 57-7); Decl. of Patrick F. Palladino Esq. (Dkt. No. 57-1).)  Plaintiffs filed their

Opposition on April 15, 2022, (*see* Pls.' Mem. of Law in Opp'n to Mot. to Dismiss ("Pls.'

Ashworth Opp.") (Dkt. No. 68)), and the Ashworth Defendants filed their reply on May 6, 2022,

(*see* Def.'s Reply Mem. of Law in Supp. of Mot. to Dismiss ("Ashworth Reply") (Dkt. No. 71)).

On March 16, 2022, Defendant Mackey also filed his instant Motion to Dismiss.  (*See*

Mackey Not. of Mot.; Def.'s Mem. of Law in Supp. of Mot. to Dismiss ("Mackey Mem.") (Dkt.

---

[2] Defendants Mackey and former Defendants Richard Hunter and Hunter Research, Inc. also filed pre-motion letters in anticipation of filing a motion to dismiss the original Complaint prior to Plaintiffs filing a First Amended Complaint.  (*See* Dkt. No. 29, Dkt. No. 31.)

No. 58-3); Aff. of Charles F. Sanders in Supp. of Mot. to Dismiss (Dkt. No. 58-1).)  Plaintiffs

filed their Opposition on April 15, 2022, (*see* Pls.' Mackey Opp.), and Mackey filed his reply on

May 6, 2022, (*see* Def.'s Reply Mem. of Law in Supp. of Mot. to Dismiss ("Mackey Reply")

(Dkt. No. 74)).

After a pre-motion conference, (*see* Dkt. (minute entry for Apr. 5, 2022)), Defendant

Greenhouse filed its instant Motion to Dismiss, (*see* Greenhouse Not. of Mot.; Def.'s Mem. of

Law in Supp. of Mot. to Dismiss ("Greenhouse Mem.") (Dkt. No. 67); Decl. of Barry

Greenhouse (Dkt. No. 66)).  Plaintiffs filed their Opposition on May 6, 2022, (*see* Pls.' Mem. of

Law in Opp'n to Mot. to Dismiss ("Pls.' Greenhouse Opp.") (Dkt. No. 73)), and Greenhouse

filed their reply on May 18, 2022, (*see* Def.'s Reply Mem. of Law in Supp. of Mot. to Dismiss

("Greenhouse Reply") (Dkt. No. 77)).

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual

allegations" to survive a Rule 12(b)(6) motion to dismiss, "a plaintiff's obligation to provide the

grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic

recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of

Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me

accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it

tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation

marks omitted).  Rather, a complaint's "[f]actual allegations must be enough to raise a right to

relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although, "once a claim has

been stated adequately, it may be supported by showing any set of facts consistent with the
allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a
claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[]
across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also
Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief
will . . . be a context-specific task that requires the reviewing court to draw on its judicial
experience and common sense.  But where the well-pleaded facts do not permit the court to infer
more than the mere possibility of misconduct, the complaint has alleged—but it has not
'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation
omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79. ("Rule 8 marks a notable and generous
departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the
doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the
factual allegation contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per
curiam), and "draw all reasonable inferences in the plaintiff's favor," *Div. 1181*, 9 F.4th at 95
(citation omitted).  Additionally, "when ruling on a Rule 12(b)(6) motion to dismiss," district
courts are directed to confine their consideration to "the complaint in its entirety, . . . documents
incorporated into the complaint by reference, and matters of which a court may take judicial
notice."  *Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (quotation marks omitted); *see also
Dashnau v. Unilever Mfg. (US), Inc.*, 529 F. Supp. 3d 235, 240 (S.D.N.Y. 2021) (same).

B.  Analysis

Plaintiffs allege in the SAC that the "RICO Defendants" and the "FOFSD Enterprise"
violated RICO, 18 U.S.C. § 1962(c), and that those same Defendants conspired to violate RICO,

in violation of 18 U.S.C. § 1962(d).  (SAC ¶¶ 279–96.)[3]  Plaintiffs also allege that all Defendants tortiously interfered with Plaintiffs' business relations.  (*Id.* ¶¶ 297–306.)  All Defendants move for dismissal of the SAC, raising overlapping arguments about the sufficiency of Plaintiffs' complaint on all three causes of action.  The Court addresses each argument to the extent necessary to decide the instant Motions.

### 1.  Allegations Against Defendant Greenhouse

As a threshold matter, the Court will address the sufficiency of the allegations against Greenhouse in the SAC.  In its Motion, Greenhouse argues, among other things, that there is a dearth of allegations specifically related to Greenhouse within the SAC, and a pleading "that lumps all of the [D]efendants together does not pass muster, particularly as to a defendant such as Greenhouse which the pleading concedes acted at a remove from the other [D]efendants." (Greenhouse Mem. 7–9.)  Greenhouse specifically argues that "[t]he only specific allegation as to Greenhouse is that it was engaged to and did issue a report . . . characterized as 'knowingly false'" in 2009, and that "Plaintiffs rely on generalized allegations about the 'Defendants' which appear designed to ask the Court to accept that the alleged conduct of Defendants collectively somehow encompasses Greenhouse." (*Id.* at 7–8.)  However, notwithstanding Greenhouse's arguments—and Plaintiffs' subsequent response—the Court notes that the SAC is deficient in a different way as it relates to Greenhouse: Plaintiffs fail to adequately allege Greenhouse's role in the RICO causes of action.

---

[3] The Court notes an error in the numbering of Plaintiffs' paragraphs in the SAC. Specifically, after paragraph 284, Plaintiffs appear to misnumber the next paragraph as "248," and the paragraphs throughout the rest of the SAC mirror the new numbers.  (*See generally* SAC.)  Because of this, the SAC contains approximately 22 overlapping paragraph numbers.  To eliminate confusion, the Court presumes that this is a mistake and as such refers to the paragraphs as if Plaintiffs listed consistent numbering.

Throughout the SAC, Plaintiffs categorize the various roles of the Defendants in the RICO causes of action.  For example, Plaintiffs allege that Ashworth, Sandy, and Farrell, along with Does 1–10, are considered the "RICO Defendants" for the purposes of the SAC.  (*See* SAC ¶ 16.)  Later in the SAC, Plaintiffs define the Friends of Fishkill Supply Depot (later referred to as the "FOFSD Enterprise") as an association-in-fact within the meaning of 18 U.S.C. § 1961(4), as the following Defendants: Ashworth, Sandy, Farrell, Mackey, and Thomson.  (*See* SAC ¶ 282; *see also id*. ¶ 283 ("At all times relevant to this Complaint, the FOFSD Enterprise was a legal entity and an enterprise within the meaning of 18 U.S.C. § 1961(4) operated, directed, and controlled by the Individual Defendants.").)  At no point does Plaintiffs define Greenhouse's alleged role in the RICO causes of action, whether as a RICO defendant itself or as a member of FOFSD Enterprise.  Even drawing all inferences in Plaintiffs' favor, as this Court must at a motion to dismiss, Plaintiffs have failed to allege the bare requirements that would guide the Court to analyze Greenhouse's alleged involvement in the alleged racketeering scheme.  *See Paul Hobbs Imports Inc. v. Verity Wines LLC*, No. 21-CV-10597, 2023 WL 374120, at *9 (S.D.N.Y. Jan. 24, 2023) (finding that a complaint that broadly pled that "[d]efendants acted in a concerted effort to affect interstate commerce" was insufficient to establish an enterprise); *id.* ("[S]imply alleging the occurrence of racketeering activity does not on its own adequately allege the existence of an enterprise, as required for a violation of [§] 1962(c)"); *see also Jordan v. Tilzer*, No. 21-1938, 2022 WL 1654435, at *2 (2d Cir. 2022) (summary order) (finding that "pointing to the defendants' shared purpose" of alleged racketeering behavior "impermissibly conflate[s] the alleged RICO enterprise with the alleged pattern of racketeering activity").

2.  Plaintiff's RICO Allegations Under § 1962(c)

Plaintiffs' substantive RICO cause of action against most moving Defendants is brought

pursuant to 18 U.S.C. § 1962(c).  Under § 1962(c), it is "unlawful for any person employed by or

associated with any enterprise engaged in, or the activities of which affect, interstate or foreign

commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's

affairs through a pattern of racketeering activity[.]"  18 U.S.C. § 1962(c).  Section 1964(c) of

"RICO creates a private cause of action for 'any person injured in his business or property by

reason of a violation of section 1962' of RICO."  *Empire Merchs., LLC v. Reliable Churchill

LLLP*, 902 F.3d 132, 139 (2d Cir. 2018) (quoting 18 U.S.C. § 1964(c)).  RICO thus permits

injured parties to sue "individuals working for an 'enterprise' that commits certain predicate

crimes that amount to a 'pattern of racketeering activity.'"  *Reich v. Lopez*, 858 F.3d 55, 59 (2d

Cir. 2017) (quoting 18 U.S.C. §§ 1962, 1964).

"To establish a civil RICO claim, a plaintiff must allege (1) conduct, (2) of an enterprise,

(3) through a pattern (4) of racketeering activity, as well as injury to business or property as a

result of the RICO violation."  *Curtis v. Greenberg*, No. 20-CV-824, 2021 WL 4340788, at *7

(E.D.N.Y. Sept. 23, 2021) (quoting *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d

106, 119 (2d Cir. 2013)); *see also Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir.

2013) (same).  "The requirements of section 1962(c) must be established as to each individual

defendant."  *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001) (citing *United States v.

Persico*, 832 F.2d 705, 714 (2d Cir. 1987) ("The focus of section 1962(c) is on the individual

patterns of racketeering engaged in by a defendant, rather than the collective activities of the

members of the enterprise, which are proscribed by section 1962(d).")).

### a.  Applicable Law: Racketeering Activity

Plaintiffs allege that Defendants "devised a scheme to 'strangle' and 'bleed' Plaintiffs by stopping or delaying Plaintiffs' commercial development so as to force the sale of Plaintiffs' property" by "creat[ing] a series of well-crafted lies aimed at devaluing Plaintiffs' property and destroying Plaintiffs' business interests."  (SAC ¶¶ 1–2.)  Specifically, Plaintiffs allege that "Defendants have made intentionally and knowingly false statements to the public, financial donors, politicians, governmental bodies, courts[,] and the media to intentionally confuse Plaintiffs' property with" the Fishkill Supply Depot.  (*Id.* ¶ 4.)  However, because Plaintiff must adequately plead that each individual defendant has committed racketeering activity, the Court must analyze Plaintiffs allegations as to each individual defendant, rather than the collective "scheme" when determining predicate unlawful acts.  *See DeFalco*, 244 F.3d at 306 ("The requirements of section 1962(c) must be established as to each individual defendant.").

"An enterprise . . . engages in a pattern of racketeering activity when its members commit at least two racketeering acts . . . that both are related to one another and have a nexus to the enterprise (the so-called predicate acts)."  *United States v. Delgado*, 972 F.3d 63, 79 (2d Cir. 2020) (citations, quotation marks, and alterations omitted), *as amended* (Sept. 1, 2020), *cert. denied sub nom. Anastasio v. United States*, 141 S. Ct. 1114 (2021).  Thus, "[t]o state a claim of a substantive RICO violation under § 1962(c), a plaintiff must allege, among other things, two or more predicate acts constituting a pattern of racketeering activity."  *Butcher v. Wendt*, 975 F.3d 236, 241 (2d Cir. 2020) (citation and quotation marks omitted).

"Section 1961(1) sets forth an exhaustive list of predicate 'acts' that can constitute a pattern of 'racketeering activity,' including section 1341 and 1343 (mail and wire fraud, respectively)."  *Williams v. Affinion Grp., LLC*, 889 F.3d 116, 124 (2d Cir. 2018).  "The mail

fraud and wire fraud statutes prohibit a person who 'devised or intended to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises,' from using the mails or interstate or foreign wire facilities 'for the purpose of executing such scheme or artifice or attempting so to do.'" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 488 (2d Cir. 2014) (quoting 18 U.S.C. §§ 1341, 1343).  Thus, "wire [and mail] fraud ha[ve] three elements: (1) a scheme to defraud, (2) money or property that is the object of the scheme, and (3) use of the wires [or mail] to further the scheme." *Empire Merchs., LLC*, 902 F.3d at 139 (citation omitted).  "The first element, the scheme to defraud, is measured by a nontechnical standard.  It is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society." *Id.* (citations and quotation marks omitted).  "To meet the second element, the plaintiff must show that the object of the scheme—'the thing obtained,' or to be obtained—is 'property in the hands of the victim . . . .'" *Id.* (quoting *Cleveland v. United States*, 531 U.S. 12, 15 (2000)).  "[A]ny [mailing or] wire that 'is part of the execution of the scheme to defraud as conceived by the perpetrator at the time' satisfies the third element." *Id.* (quoting *Schmuck v. United States*, 489 U.S. 705, 715 (1989)).  "Although the mailed or wired communication need not itself be fraudulent to violate [the fraud statutes], it must, by the terms of the statutory sections, be made in furtherance of the fraudulent scheme." *Crawford*, 758 F.3d at 488.

Importantly, RICO claims alleging fraudulent predicate acts "are subject to the heightened pleading standards of [Federal Rule of Civil Procedure] 9(b), which requires that averments of fraud be 'stated with particularity.'" *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013) (alterations omitted) (quoting Fed. R. Civ. P. 9(b)).  In the context of a civil RICO claim, "all allegations of fraudulent predicate acts[ ] are subject to the heightened pleading

requirement of [Rule 9(b)]." *First Cap. Asset Mgmt, Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004).

In general, "[p]laintiffs must plead . . . mail [or wire] fraud with particularity, and establish that the [communications] were in furtherance of a fraudulent scheme." *Lundy*, 711 F.3d at 119. This normally requires that "[a]llegations of predicate mail and wire fraud acts . . . state the contents of the communications, who was involved, and where and when they took place, and should explain why they were fraudulent." *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008) (alterations, citations, and quotation marks omitted). "To satisfy this requirement, a complaint must specify the time, place, speaker, and content of the alleged misrepresentations, explain how the misrepresentations were fraudulent and plead those events which give rise to a strong inference that the defendant had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *Cohen*, 711 F.3d at 359 (citation and quotations omitted). "RICO claims premised on mail or wire fraud must be particularly scrutinized because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Crawford*, 758 F.3d at 489 (citation omitted).

However, "courts in the Second Circuit have applied a different standard in cases where plaintiff claims that mails or wires were simply used in furtherance of a master plan to defraud, but does not allege that the communications themselves contained false or misleading information." *Angermeir v. Cohen*, 14 F. Supp. 3d 134, 145 (S.D.N.Y. 2014) (alterations, citation, and quotation marks omitted). "In such cases, including complex civil RICO actions involving multiple defendants, Rule 9(b) does not require that the temporal or geographic particulars of each mailing or wire transmission made in furtherance of the fraudulent scheme be

stated with particularity." *Id.* at 145–46 (citation and quotation marks omitted).  "Instead, Rule 9(b) requires only that the plaintiff delineate with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme."  *Id.* (citation and quotation marks omitted); *see also Bd. of Managers of Trump Tower at City Ctr. Condo. v. Palazzolo*, 346 F. Supp. 3d 432, 456–57 (S.D.N.Y. 2018) (collecting cases).

Here, all Defendants argue that Plaintiffs fail to allege with the requisite particularity that any Defendant committed RICO predicate acts, let alone two predicate acts.  (*See* Thomson Mem. 4–7; Ashworth Mem. 6–10; Mackey Mem. 12–13.)  In sum and substance, Defendants argue that "Plaintiffs' entire [SAC] follows the same pattern of generalized allegations against 'defendants' with a complete lack of specificity in each allegation as required as a matter of law."  (Ashworth Mem. 10; *see also* Mackey Mem. 12–13 ("Plaintiffs assert in conclusory fashion that they were the victims of a fraudulent scheme . . . .").)  The Court will, as it must, address the alleged predicate acts for each Defendant.

### b.  Application: Mackey

Starting with Mackey, while Plaintiffs allege that "Mackey's coordination with the other [D]efendants was integral to [D]efendants' . . . scheme, causing Plaintiffs to spend millions of dollars [more] than would otherwise have been required," (SAC ¶ 17), Plaintiffs fail to sufficiently allege that Mackey undertook *any* requisite predicate acts.  While Plaintiffs in Opposition outline numerous "allegations" against Mackey, hardly any allegation listed represents a predicate act of mail or wire fraud.  (*See* Pls' Mackey Opp. 3–5.)  In support of this strategy, Plaintiffs argue that their "allegations that Mackey controlled the conduct of the FOFSD is sufficient to meet their pleading burdens."  (*Id.* at 11; *see also id.* ("Mackey argues that Plaintiffs must detail his specific role in the commission of the RICO violations.  Put another

30

way, Mackey contends that Plaintiffs cannot meet the pleading standard based on allegations asserted against 'all defendants.'  Mackey is wrong.")  However, Plaintiffs are wrong as they conflate the two ways a plaintiff can plead requisite acts under Section 1962(c).

At best, Plaintiffs allege two specific false statements transmitted by Mackey.  First, Plaintiffs allege that Mackey, on behalf of the NYSPHO, sent a letter to an associate of Broccoli's regarding a discussion between the two, and "without justification or cause copied the Town of Fishkill Board members."  (SAC ¶ 63.)  And in that letter, Plaintiffs allege that "Mackey knowingly and intentionally echoed the false information stated in the 2009 Report and misrepresented the results" of the 2008 GPR study, to "support his recommendation that the entire Property be preserved and that hundreds of Revolutionary War soldiers were buried on the Property.  (*Id*. ¶ 64.)  Second, Plaintiffs allege that "Defendants, including Ashworth, Farrell, Sandy[,] and Mackey . . . used the social media profile 'Old Albany Post Road History' to further their fraudulent scheme . . . [a]s recently as November of 2021," when "Defendants published the following statement, while referring to the property: 'hundreds of graves that date back to the Revolutionary War have been found at the Fishkill Supply Depot.'"  (*Id*. ¶¶ 101–02 (alterations omitted).)

The fact that Plaintiffs allege that Mackey himself was knowingly transmitting false information is a crucial distinction dictating how this Court must analyze the requisite pleading standards under Rule 9(b).  In briefing, Plaintiffs confusingly misstate the requirements of mail and wire fraud, attempting to distinguish authority cited by Mackey as "instances where the plaintiffs received the fraudulent communications at issue."  (Pls' Mackey Opp. 11.)  While Plaintiffs do not explain why that would be relevant, as mail and wire fraud do not require that a plaintiff *receive* the fraudulent communication, Plaintiffs argue that their allegations that

31

"Mackey controlled the conduct of the FOFSD" are sufficient to meet their burden to plead requisite acts.  (*Id*.)  Taken charitably, Plaintiffs seem to be invoking the slightly relaxed Rule 9(b) pleading standards, which only apply when a plaintiff "does not allege that the communications themselves contained false or misleading information."  *Angermeir*, 14 F. Supp. 3d at 145 (citation, quotation marks, and alterations omitted); *see also id.* at 145–46 ("In such cases, including complex civil RICO actions involving multiple defendants, Rule 9(b) does not require that the temporal or geographic particulars of each mailing or wire transmission made in furtherance of the fraudulent scheme be stated with particularity . . . [but] requires only that the plaintiff delineate with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme." (quotation marks and citation omitted)).  However, Plaintiffs cannot have it both ways.  If Plaintiffs allege specific false statements allegedly made by Mackey, as they have done throughout the SAC, the sufficiency of Plaintiffs' allegations must be reviewed under the standard Rule 9(b) pleading standard, requiring that "[a]llegations of predicate mail and wire fraud acts . . . state the contents of the communications, who was involved, and where and when they took place, and [should] explain why they were fraudulent."  *Spool*, 520 F.3d at 185 (alterations, citation, and quotation marks omitted).  Plaintiffs cannot fall back on their allegations that "Mackey controlled the conduct of the FOFSD" to establish the clear prerequisite to a civil RICO claim under § 1962(c): that every Defendant has committed two requisite predicate acts.

Looking to the possible predicate acts that Plaintiffs did plead as to Mackey, the Court concludes Plaintiffs fail to satisfy the Rule 9(b) heightened pleading standard.  As to Plaintiffs' allegation that Mackey sent a letter to Broccoli's business associate that "intentionally echoed the false information stated in the 2009 Report," this allegation falls short of Plaintiffs' pleading

requirements.  First, Plaintiffs fail to plead with particularity when this alleged letter was sent, instead vaguely referring to a letter sent "following the filing of the 2009 Report."  (SAC ¶¶ 63–64.)  Second, Plaintiffs do not allege exactly what was said in the letter, instead alleging that Mackey "echoed the false information stated in the 2009 Report" without pointing to what statements were indeed false.  (*Id.* ¶ 64.)  Third, Plaintiffs fail to "plead those events which give rise to a strong inference that the defendant had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth."  *Cohen*, 711 F.3d at 359 (citation and quotations omitted).  "Rule 9(b) permits knowledge to be averred generally, but plaintiffs . . . still must plead the factual basis which gives rise to a strong inference of fraudulent intent."  *United States v. Strock*, 982 F.3d 51, 66 (2d Cir. 2020) (citation and quotations omitted).  "An inference is 'strong' if it is 'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 176–77 (2d Cir. 2015) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007)).  "The requisite strong inference of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Strock*, 982 F.3d at 66 (citation omitted).  Even taking Plaintiffs' allegations as true, Plaintiffs do not allege anywhere in the SAC that Mackey directly knew or was otherwise told that the statements were fraudulent.  (*See generally* SAC.)  Instead, Plaintiffs ask the Court to infer Mackey's knowledge from his "understanding of the historical use of the [P]roperty," (Pls.' Mackey Opp. 4.), which would allegedly indicate to Mackey that the assertions in the 2009 Report were false.  Plaintiffs do this by alleging Mackey's motive was to "support his recommendation that the entire Property be preserved and that hundreds of Revolutionary War soldiers were buried on the Property."

(SAC ¶ 64.)  This allegation simply restates Plaintiffs' theory of the entire RICO action, is conclusory, and is insufficient to establish a "strong inference" of knowledge under Rule 9(b).[4]

As to Plaintiffs' second allegation regarding Mackey's involvement in the "Old Albany Post Road History" social media page, Plaintiffs failed again to plead with any particularity as to how Mackey was involved in the social media profile.  (*See id*.  ¶ 102 (simply stating that "Defendants, including Ashworth, Farrell, Sandy[,] and Mackey have used the social media profile 'Old Albany Post Road History' to further their fraudulent scheme").)

Accordingly, as Plaintiffs have not sufficiently pled any requisite predicate acts undertaken by Mackey, the Court grants Mackey's motion to dismiss with respect to the RICO claims.

### c.  Application: Thomson

Next, Plaintiffs outline various allegations against Thomson, largely surrounding Thomson's allegedly hidden association with FOFSD.  (SAC ¶¶ 212–33.)  Plaintiffs focus on Thomson's "close ties" with Ashworth and Farrell, and implicate Thomson in his role as Ashworth and Farrell's "Architect" who drew up plans to preserve the Property.  (*Id*. ¶¶ 212–13.) Liberally construed, Plaintiffs allege two specific examples of Thomson's use of the wires in furtherance of the predicate acts.  First, Plaintiffs allege that, on or around June 3, 2013, "[e]mails were sent by Defendant[] Ashworth to Defendants Farrell and Thomson, as well as to Plaintiffs to confirm" meetings to discuss the acquisition of the Property.  (*Id*. ¶ 214.)  Plaintiffs allege that "[t]he emails confirm that Thomson . . . was participating on behalf of Defendants in discussions with Plaintiffs to acquire the Property."  (*Id*.)  Second, Plaintiffs allege that at a 2015

---

[4] Moreover, the fact that Mackey "contradicted his earlier positions in a January 13, 2021 affidavit" is irrelevant to the question at hand: whether Mackey had an intent to defraud when making the allegedly false statements.  (Pls' Mackey Opp. 4.)

Planning Board meeting, Ashworth was communicating with Thomson via phone and computer to feed Thomson "negative comment[s]" to state on the record about Continental Commons.  (*Id.* ¶ 218.)

Because Plaintiffs do not allege specific fraudulent statements made by Thomson, Plaintiffs appear to be invoking the "different standard" in the Second Circuit where a "plaintiff claims that mails or wires were simply used in furtherance of a master plan to defraud, but does not allege that the communications themselves contained false or misleading information." *Angermeir*, 14 F. Supp. 3d at 145 (citation, quotation marks, and alteration omitted).  Indeed, Plaintiffs argue that they have established that Thomson violated RICO by "alleg[ing] that Thomson, who is close with [D]efendant Ashworth, met with [D]efendants on several occasions to devise a scheme to use interstate wire services to spread fraudulent statements about the historical value of [P]laintiffs' property in order to raise money to sabotage the development of Plaintiff's property."  (Pls.' Thomson Opp. 6.)  However, Plaintiffs appear to misinterpret the relevant caselaw and have not adequately plead predicate acts as to Thomson.

Under this alternate standard, it is true that in "complex civil RICO actions involving multiple defendants," Rule 9(b) "requires only that the plaintiff delineate with adequate particularity in the body of the complaint, the specific circumstances constituting the overall fraudulent scheme."  *Angermeir*, 14 F. Supp. 3d at 145. (quotation marks and citation omitted); *see also Trump Tower*, 346 F. Supp. 3d at 456–57 (collecting cases).  Ultimately, even under this alternate standard, the Court's role is to determine whether the SAC's allegations are

> sufficiently particular to serve the three goals of Rule 9(b), which are (1) to provide a defendant with fair notice of the claims against him or her; (2) to protect a defendant from harm to reputation or goodwill by unfounded allegations of fraud; and (3) to reduce the number of strike suits.

*Trump Tower*, 346 F. Supp. 3d at 458 (citing *Am. Fin. Int'l Grp.-Asia, L.L.C. v. Bennett*, No. 05-CV-8988, 2007 WL 1732427, at *6 (S.D.N.Y. June 14, 2007)).  Importantly, in cases where courts have found that a plaintiff has sufficiently alleged mail and wire fraud predicate acts under civil RICO, courts have analyzed schemes that overwhelmingly *require* the use of mail or wires to perpetuate the alleged fraud.  *See Trump Tower*, 346 F. Supp. 3d at 458–59 (describing a scheme where several high level executives controlled a scheme overcharging patrons for parking and staffing and "divert[ed] enormous unauthorized monthly fees" for personal gain); *Angermeir*, 14 F. Supp. 3d at 149–50 (discussing a case where a plaintiff had properly alleged that defendants "engaged in a pattern of racketeering activity by extorting money from the plaintiffs by threatening and initiating lawsuits against them . . . to recover on fraudulent leases" (alteration omitted)); *Serin v. N. Leasing Sys., Inc.*, No. 06-CV-1625, 2009 WL 7823216, at *6–9 (S.D.N.Y. Dec. 18, 2009) ("[I]t is also unnecessary for the [p]laintiffs to allege that each of the individual [d]efendants personally committed at least two of the predicate acts of mail and/or wire fraud.  It is sufficient that the Plaintiffs allege that the individuals committed the predicate acts of mail and wire fraud by directing [the company] and its employees to use the mails and/or wires to further the fraudulent scheme.").  For example, in *Trump Tower*, the Court found that the plaintiff sufficiently alleged predicate acts against each defendant where the defendants worked together to allegedly transfer almost $700,000 of a condominium's money to an enterprise over seven years.  *See Trump Tower*, 346 F. Supp. 3d at 458.  The court found that, while some defendants were not alleged to have been involved in all of the transactions, some were alleged to have "facilitated the fraudulent transfer of funds" through their activities with the condominium board.  *Id*. at 458–59.  Moreover, the plaintiff alleged that these employees

"participated in and benefited from" the acts of the other defendants who actually perpetuated the mail and wire fraud.  *Id*. at 459–60.

Here, with respect to Thomson, Plaintiffs have *at most* alleged that Thomson was on notice of *an* alleged fraud—namely, by describing the Property as the site of Revolutionary War burials.  However, Plaintiffs have not alleged that Thomson was on notice of *mail or wire* fraud, which is the predicate act of civil RICO as alleged by Plaintiffs.  Throughout the SAC, Plaintiffs argue that Defendants used numerous means to perpetuate the alleged fraud confusing the Property with other protected land, including through methods such as conversations, investigations, and other statements by various parties *in addition* to actions traditionally considered to be a part of the requisite predicate acts, such as fundraising letters, emails, and text messages.  (*See generally* SAC.)  The SAC makes clear that Plaintiffs believe that this "strangle and bleed" scheme was all encompassing, with very few participants as alleged actually *using* mail or wires to contribute to the scheme.  Given the paucity of Plaintiffs' allegations, the Court finds that Thomson did not have fair notice of the claims against him because, unlike other cases that rely upon the alternate standard of Rule 9(b), the fraud as alleged by Plaintiffs is not overwhelmingly based in the requisite predicate acts.  *See, e.g., Trump Tower*, 346 F. Supp. 3d at 458–59; *Angermeir*, 14 F. Supp. 3d at 149–50; *Serin*, 2009 WL 7823216, at *6–9.

Without this, it is clear that Plaintiffs have not alleged with sufficient particularity that Thomson has himself committed two acts of mail or wire fraud.  Specifically, Plaintiffs first example of Thomson's predicate acts is plainly insufficient.  Even as alleged, Thomson being copied on an email confirming a meeting between Ashworth, Farrell, Thomson, and Plaintiffs does not indicate any intent to defraud, nor does the Court credit Plaintiffs' conclusory allegation

that these emails "confirm that Thomson . . . was participating on behalf of Defendants in discussions with Plaintiffs to acquire the Property."  (SAC ¶ 214.)

Accordingly, as Plaintiffs have not sufficiently pled two predicate acts undertaken by Thomson, the Court grants Thomson's motion to dismiss with respect to the RICO claims.

### d.  Application: Farrell

For similar reasons, Plaintiffs have failed to adequately plead predicate acts by Farrell. Plaintiffs plead two specific instances in which Farrell used mail or wires.  First, Plaintiffs allege that Farrell, along with Ashworth, Sandy, and Mackey, "used the social media profile 'Old Albany Post Road History' to further their fraudulent scheme . . . [a]s recently as November of 2021," when "Defendants published the following statement, while referring to the property: 'hundreds of graves that date back to the Revolutionary War have been found at the Fishkill Supply Depot.'"  (SAC ¶¶ 101–02.)  Second, Plaintiffs allege that Farrell was included on the emails from Ashworth to Thomson and Plaintiffs to confirm meetings discussing the acquisition of the Property.  (*Id*. ¶ 214.)  As discussed supra, neither of these allegations is plead with sufficient particularity to sustain a mail- or wire-fraud based predicate act.  *See* Sections II.A.2.b–c.

Plaintiffs argue that the allegations against Farrell (as well as Ashworth and Sandy) satisfy Rule 9(b) "both because Plaintiffs allege that each [D]efendant controlled the enterprise, and because Plaintiffs' complaint informs each [D]efendant of the nature of their alleged participation in the fraud."  (Pls.' Ashworth Opp. 9.)  However, Plaintiffs' argument fails for two reasons.  First, Plaintiffs cites caselaw that is more commonly associated with the enterprise element of civil RICO, rather than the predicate acts.  (*See id*. (citing *Limpert v. Cambridge Credit Counseling Corp.*, No. 3-CV-5986, 2006 WL 8441003, at *5 (E.D.N.Y. Aug. 30, 2006)

(citing *Baisch v. Gallina*, 346 F.3d 366, 376 (2d Cir. 2003)).)  *See also Trump Tower*, 346 F. Supp. 3d at 461 (analyzing the "operation and management test" under the enterprise requirement); *First Cap.*, 385 F.3d at 176–77 (same); *Baisch*, 346 F.3d at 376 (same).  Since "enterprise" and "racketeering activity" are separate elements of a civil RICO claim, Plaintiffs must adequately plead that Farrell, as well as all other Defendants, committed predicate acts outside of Defendants alleged involvement in the enterprise.  *See DeFalco*, 244 F.3d at 306 ("The requirements of section 1962(c) must be established as to each individual defendant."); *cf. Limpert*, 2006 WL 8441003, at *4 (separately finding the plaintiff adequately alleged seventy-three examples of mail and wire fraud, including "dates these fraudulent statements were communicated by various [d]efendant companies to [p]laintiffs" as well as "the sender and recipient of the statements" and "the statements themselves are quoted").

Second, Plaintiffs argue that "[i]t is not necessary to allege . . . that the defendants have personally used the mails or wires; it is sufficient that a defendant 'causes' the use of mails or wires."  (Pls' Ashworth Opp. 9 (quoting *Stein v. N.Y. Stair Cushion Co., Inc.*, No. 04-CV-4741, 2006 WL 319300, at *6 (E.D.N.Y. Feb. 10, 2006)).)  To be sure, "it is not significant for purposes of the mail fraud statute that a third-party, rather than the defendant, wrote and sent the letter at issue, provided [that] the defendants could have reasonably foreseen that the third-party would use the mail in the ordinary course of business as a result of defendants' act."  *Stein*, 2006 WL 319300, at *6 (quoting *United States v. Bortonvsky*, 879 F.2d 30, 36 (2d Cir. 1989)).  However, as discussed above in relation to Thomson, Plaintiffs have not adequately pled that Farrell could have "reasonably foreseen" that her actions, as alleged, would lead to predicate civil RICO acts, specifically mail or wire fraud in this action.  Instead, at best Plaintiffs have established that Farrell knew that the alleged fraud could be perpetuated *somehow*, but not

specifically through mail or wires.  To find otherwise would render the Rule 9(b) notice requirements irrelevant in civil RICO actions.

Finally, Plaintiffs argue that they adequately pled Farrell's involvement in FOFSD's public facing statements discussed throughout the Complaint.  (*See* Pl's Ashworth Opp. 11.)  In the SAC, Plaintiffs allege that Farrell "served as an advisory board member to the FOFSD, and handled the FOFSD's public relations efforts," and "developed the FOFSD's public statements and strategy with respect to the Property."  (SAC ¶ 79.)  On its face, this allegation could be sufficient to successfully impute broader-pled statements by Plaintiffs about "Defendants" statements through the FOFSD.  (*See, e.g. id.* ¶ 86 ("Defendants have also published knowingly false statements on the website of the FOFSD."); *id.* ¶ 94 (alleging that Defendants "encourage donations with knowingly false statements" in press releases).)  However, even assuming all inferences toward Plaintiffs, as the Court must at this stage, Plaintiffs fail to plead Farrell's role in the alleged fraudulent scheme with enough particularity to infer that Farrell herself was involved in these statements.  For example, Plaintiffs do not allege that, in her capacity as an advisory board member who "developed the FOFSD's public statements and strategy," Farrell was involved in anything with the website or other public-facing statements (outside of Farrell's testimony before Congress).[5]  An allegation about Farrell's development of FOFSD's strategy toward the Property, occurring at an unspecified time, cannot sustain Plaintiffs' numerous allegations lodged at Defendants as a whole without additional particularity as required by Rule 9(b).

---

[5] As discussed *supra*, Plaintiffs' allegation that Farrell contributed to a Facebook page along with several other Defendants is conclusory.  (*See* SAC ¶ 102.)

Accordingly, as Plaintiffs have not sufficiently pled two predicate acts undertaken by Farrell, the Court grants Farrell's motion to dismiss with respect to the RICO claims.

### e.  Application: Sandy

For similar reasons, the Court concludes that Plaintiffs have failed to adequately plead predicate acts by Sandy.  Even under Plaintiffs' own recitation of the SAC, Plaintiffs have not alleged a single act by Sandy with any particularity to indicate he participated in mail or wire fraud.  Plaintiffs claim that Sandy "seeded Plaintiffs' property with a buckle to later 'discover' it as a Continental Army shoe buckle," (Pls' Ashworth Opp. 12; SAC ¶¶ 112–14); Sandy "trespassed on and manipulated Plaintiffs' property to dig grave shafts," (Pls' Ashworth Opp. 12; SAC ¶ 117); and allege without any particularity that "Defendants," presumably including Sandy, used this buckle to "solicit donations," (Pls' Ashworth Opp. 12; SAC ¶ 115).  And, as discussed in relation to Farrell, Plaintiffs assert that Sandy was "a member of FOFSD who controlled the RICO enterprise."  (Pls' Ashworth Opp. 12.)[6]  For reasons noted above, these allegations fall short of plausibly stating a RICO claim against Sandy.

Accordingly, as Plaintiffs have not sufficiently pled two predicate acts undertaken by Sandy, the Court grants Sandy's motion to dismiss with respect to the RICO claims.

### f.  Application: Ashworth

Finally, the Court will address Defendant Ashworth, who Plaintiffs describe as the mastermind of the alleged scheme against Plaintiffs' business by leading a "multi-layered web of information laundering, historical and archaeological distortion, physical alteration of Plaintiffs' property and making knowingly false statements to federal, state[,] and local governmental

---

[6] As discussed supra, Plaintiffs' allegation that Sandy contributed to a Facebook page along with several other Defendants is conclusory.  (*See* SAC ¶ 102.)

entities." (SAC ¶ 8.)  Not surprisingly, Ashworth argues that Plaintiffs have not identified a

single sufficient predicate act as to Ashworth, outside of a collection of emails that are either

time barred or otherwise are not fraudulent as alleged. (Ashworth Mem. 8–9.)  In addition,

Ashworth argues that Plaintiffs continue to "repeat . . . the pattern in the [SAC] by noting various

unfounded, speculative[,] and conclusory general allegations insufficient to support RICO

claims." (*Id*. at 9–10.)  As discussed below, the Court agrees.

Construing the SAC in the light most favorable to the Plaintiffs, as this Court must, there

are at most four potential predicate acts that Plaintiff has adequately alleged Ashworth's

involvement.[7]  First, Plaintiffs allege that Ashworth "misrepresented archaeological evidence

when completing applications to the National Parks Service and the New York State Economic

Development Council." (SAC ¶ 202.)  However, this allegation does not allege the "use of the

wires [or mail] to further the scheme," on its face. *Empire Merchs., LLC*, 902 F.3d at 139

(citation omitted).  Second, Plaintiffs allege that FOFSD sent a fundraising letter to potential

donors signed by Ashworth, which discusses the property as "a commercial development on the

National Register of Historic Places site known as the Fishkill Supply Depot" and likely

references the instant Action. (SAC ¶ 204.)  This letter could constitute a predicate act as

Plaintiffs do allege that it was "sent by interstate or commercial carrier," however Plaintiffs do

not allege when this letter was sent for purposes of statute of limitations analysis.  Third,

Plaintiffs allege that Ashworth "routinely claims" false information in various news articles

published in print and online. (*See e.g. id*. ¶¶ 161–63, 257.)  "However, these allegations amount

---

[7] As discussed supra, Plaintiffs' allegation that Ashworth contributed to a Facebook page along with several other Defendants is conclusory. (*See* SAC ¶ 102.)  In addition, Plaintiffs' allegation that Ashworth sent emails to confirm meetings between Farrell, Thomson, and Plaintiffs is insufficient to establish predicate acts, as there is no allegations of a fraudulent statement or any intent to defraud. (*See* SAC ¶ 214.)

to little more than an attempt to spin an alleged scheme to harm a plaintiff's professional reputation into a RICO claim." *Hollander v. Pressreader*, No. 19-CV-2130, 2020 WL 2836189, at *4 (S.D.N.Y. May 30, 2020) (citation and quotation marks omitted). "It is well-established . . . that reputational harm alone, cannot support a claim for mail or wire fraud." *Rajaratanam v. Motley Rice, LLC*, 449 F. Supp. 3d 45, 73 (E.D.N.Y. 2020); *see also United States v. Ferrara*, 701 F. Supp. 39, 43 (E.D.N.Y. 1988), *aff'd*, 868 F.2d 1268 (2d Cir. 1988) ("[I]f one's reputation—standing alone—could be construed as property, then any ordinary defamation action could be brought under the mail fraud statute—a startling proposition."). Fourth and finally, Plaintiffs allege that Ashworth signed a letter from the FOFSD to the CEO of IHOP, which contained "false and misleading archaeological and historical information mentioned throughout [the SAC.]" (SAC ¶ 253.) However, Plaintiff fails to plead with any particularity what was discussed in the letter, in contravention of the requirements of Rule 9(b).

Plaintiffs argue that the SAC is "replete with allegations of Ashworth's statements and actions in furtherance of the fraudulent scheme," citing several allegations which this Court has found are insufficient. (Pls.' Ashworth Opp. 11–12.) In addition, Plaintiffs list a long set of examples of "misrepresentations[] which [D]efendants fail to address, but which nevertheless are sufficiently alleged." (*Id*. at 12.) However, all of Plaintiffs' listed allegations are not predicate acts, rather they are generalized allegations of misconduct by Ashworth, including Ashworth allegedly telling people that he wanted to "wrest[] ownership of the Property from Plaintiffs," (*see* SAC ¶¶ 5, 6, 146), allegations about Ashworth's plan to physically alter the Property, (*see id.* ¶¶ 46, 113, 117, 135), discussions of surreptitiously recorded conversations, (*see id.* ¶ 92), and other generalized allegations about "Defendants" activities on the internet, (*see id.* ¶¶ 99, 102). Plainly, none of Plaintiffs' listed allegations comes close to alleging a predicate act as

required by RICO.  *Butcher*, 975 F.3d at 241 ("To state a claim of a substantive RICO violation

under § 1962(c), a plaintiff must allege, among other things, two or more predicate acts

constituting a pattern of racketeering activity." (citation and quotation marks omitted)); *DeFalco*,

244 F.3d at 306 ("The requirements of section 1962(c) must be established as to each individual

defendant.").

At bottom, Plaintiffs are attempting to "spin an alleged scheme to harm [Plaintiffs']

reputation into a RICO claim . . . and federal courts routinely and soundly reject such attempts."

*Rajaratnam*, 449 F. Supp. 3d at 73–74 (collecting cases) (quotation marks omitted).  Plaintiffs

have not established two predicate acts as to Ashworth as required to sustain a RICO claim, and

accordingly, Plaintiffs have failed to plead the predicate acts of mail or wire fraud as to any of

the defendants.  The Court grants all the pending Motions to Dismiss with respect to the §

1962(c) claims.

### 3.  Plaintiff's RICO Allegations under § 1962(d)

Plaintiffs also raise a RICO conspiracy claim under 18 U.S.C. § 1962(d).  (*See* SAC ¶¶

294–96.)  "To establish a conspiracy to violate the civil RICO statute pursuant to 18 U.S.C. §

1962(d) . . . plaintiff must prove (1) that there existed a conspiracy to commit acts that, if

successful, would constitute a substantive civil RICO violation; (2) that defendant agreed to join

in, and knowingly participated in, that conspiracy; and (3) that defendant acted in furtherance of

the conspiracy in some manner (although not necessarily by the commission of any RICO

predicate acts himself)."  *Martin Hilti Fam. Tr. v. Knoedler Gallery, LLC*, 386 F. Supp. 3d 319,

340 (S.D.N.Y. 2019) (citation and quotation marks omitted).  A defendant must have agreed to

participate "in a charged enterprise's affairs through a pattern of racketeering, not [simply] a

conspiracy to commit predicate acts."  *De Sole v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 387,

409 (S.D.N.Y. 2015) (quotation marks omitted) (quoting *United States v. Pizzonia*, 577 F.3d 455, 463 (2d Cir. 2009)); *see also Crawford*, 758 F.3d at 487 ("To establish a violation of § 1962(c), a plaintiff must show that the defendant conducted, or participated in the conduct[ ] of[,] a RICO enterprise's affairs through a pattern of racketeering activity.").  Because Plaintiffs have not sufficiently stated a substantive RICO claim under § 1962(c), Plaintiff's conspiracy claim must also fail.  See *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996) ("Since we have held that the prior claims do not state a cause of action for substantive violations of RICO, the present claim does not set forth a conspiracy to commit such violations."), *vacated on other grounds*, 525 U.S. 128 (1998); *Paul Hobbs Imports Inc.*, 2023 WL 374120, at *13 ("Thus, since the Complaint does not predicate its subsection 1962(d) count on an agreement to engage in any conduct other than the acts alleged to violate subsection 1962(c), the Court's dismissal of the substantive count requires dismissal of the conspiracy count as well.").

Accordingly, Plaintiffs' allegations of RICO conspiracy are dismissed as to all Defendants.

### 4.  Remaining State Law Claims

Finally, Plaintiff raises a single claim under state law: tortious interference with business relations.  (*See* SAC ¶¶ 297–306.)  In light of the Court's dismissal of Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over these state law claims.  *See* 28 U.S.C. § 1367(c)(3) ("District courts may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction. . . .").  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining

state-law claims." *Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (quotation marks omitted) (quoting *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003)); *see also One Commc'ns Corp. v. JP Morgan SBIC LLC*, 381 F. App'x 75, 82 (2d Cir. 2010) (summary order) ("If all of a plaintiff's federal claims are dismissed, a district court is well within its discretion to decline to assert supplemental jurisdiction over any state law claims. . . .").

### III. Conclusion

For the foregoing reasons, the Thomson Motion is granted, the Ashworth Defendants' Motion is granted, the Greenhouse Motion is granted, and the Mackey Motion is granted. Because this is the first adjudication of their claims on the merits, Plaintiffs' claims are dismissed without prejudice.  If Plaintiffs wish to file a Third Amended Complaint alleging additional facts and otherwise addressing the deficiencies the Court has identified, Plaintiffs must do so within 30 days of the date of this Order.  The third amended complaint will replace, not supplement, the previous complaints.  The failure to timely file an amended complaint may result in the dismissal of this Action with prejudice.  The Clerk of Court is respectfully directed to terminate the pending Motions. (*See* Dkt. Nos. 56, 57, 58, 65.)

SO ORDERED.

Dated:    March 28, 2023
       White Plains, New York

                                     KENNETH M. KARAS
                               United States District Judge